172 Cal.App.4th 1268 (2009)
___ Cal.Rptr.3d ___
In re R.W., a Person Coming Under the Juvenile Court Law.
ORANGE COUNTY SOCIAL SERVICES AGENCY, Plaintiff and Respondent,
v.
A.W., Defendant and Appellant.
No. G040791.
Court of Appeals of California, Fourth District, Division Three.
March 26, 2009.
*1269 Patti L. Dikes, under appointment by the Court of Appeal, for Defendant and Appellant.
Benjamin P. de Mayo, County Counsel, and Karen L. Christensen, Deputy County Counsel, for Plaintiff and Respondent.
No appearance for Minor.

*1270 OPINION
FYBEL, J. 

INTRODUCTION
A.W. (Mother) is the mother of R.W., who was taken into protective custody at the age of nine in May 2001. Mother appeals from the juvenile court order made on July 17, 2008, limiting Mother's right to make educational decisions for R.W. and the order consenting to the implementation of an individualized education plan (IEP)[1] recommendation to place R.W. at the Cathedral Home in Laramie, Wyoming. We conclude the orders were not an abuse of the juvenile court's discretion and therefore affirm.

FACTS AND PROCEEDINGS IN THE JUVENILE COURT

R.W.'s History in the Dependency System
When the juvenile court made the order limiting parents' educational rights, R.W. was 16 years old and had been in the dependency system for over seven years. R.W. and her three siblings were removed from the parents' custody in May 2001 based on charges both Mother and R.W.'s stepfather physically and emotionally abused them. (R.W.'s father is not a party to the appeal and his whereabouts are unknown.) In May 2001, the juvenile court ordered the children detained and, in September 2001, declared them dependent children of the court under Welfare and Institutions Code section 360, subdivision (d).
Due to her increasing behavioral problems, psychological evaluations were ordered for R.W., and the court approved a request to prescribe her psychotropic drugs. She has remained on a periodically adjusted regimen of psychotropic medications since then.
*1271 Throughout her time in the dependency system, R.W. has suffered from severe emotional and behavioral problems that have manifested themselves in tantrums, assaults, "`intense aggressive behaviors,'" defiance, death threats, and destruction of property. As early as November 2002, her behavior was described as "`dangerous'" and she had required physical restraint "on numerous occasions including protective separation." In 2006, one group home asked the Orange County Social Services Agency to remove her because she had made death threats to staff members and residents. She was placed in juvenile hall in 2006 and again in 2007 for assaulting staff and destroying property. By August 2007, R.W. had two separate delinquency charges of assault and battery against her.
When detained in 2001, R.W. was placed in the Orangewood Children's Home (Orangewood). Since then, R.W. has been moved no less than 18 times. She has been placed in four different group homes, has been returned unsuccessfully to Mother for a 60-day trial period, has been placed unsuccessfully with a stepfather, has had two unsuccessful foster placements, has been hospitalized twice, has been placed in juvenile hall twice, has lived with siblings, and has been in and out of Orangewood six times. A potential foster placement with relations in Indiana did not come through.
In November 2002, the juvenile court terminated reunification services and found R.W. was not adoptable and had nobody willing to accept legal guardianship. The court ordered R.W. to remain in long-term foster care. Nonetheless, R.W. moved back in with Mother on a 60-day trial basis in February 2004. During the trial visit, Mother protested against participating in in-home counseling, avoided R.W.'s therapeutic behavioral services coach, did not return phone calls from social workers, and took R.W. to only two individual therapy sessions in seven weeks.
The trial visitation ended abruptly in April 2004, when R.W. was hospitalized after being left with her maternal grandmother while Mother went on a trip to Las Vegas. R.W. alleged she had been abused while in the grandmother's care.
In August 2007, R.W. was placed with her sister, who was living in an apartment with their younger brother. The placement seemed to go well at first, but ended sadly in January 2008, when R.W. lost her temper after her sister would not let her use the computer. The brother had to physically restrain R.W. while her sister called the police. R.W. was hospitalized, then *1272 returned to Orangewood in January 2008. R.W. has lived at Orangewood since then. Every attempt to find a suitable placement for her has been unsuccessful.

R.W.'s Education
R.W.'s place of schooling periodically changed too. For over three years, she attended "non-public" elementary and junior high schools in Orange. At a meeting in September 2005, an IEP for R.W. was developed by which she would transition to public high school. In late 2005, while residing at a group home, she started this transition to a public high school in Costa Mesa, and attended that public high school full time starting in January 2006. Later that year, when she returned to Orangewood, she started attending its onsite school.
After being placed in a foster home in late 2006, R.W. started attending public high school in Cypress. She continued at the public high school while living with her sister. When R.W. was returned to Orangewood in January 2008, she reentered its onsite school, where she earned an award for most improved in academics. R.W.'s grades at every school have generally been good, usually C's and B's, with some A's, a few D's and some F's in physical education.

Appointment of Educational Attorney and IEP Team
In June 2006, the juvenile court appointed an educational attorney, Kathleen Loyer, to represent R.W.'s educational needs. In September 2006, R.W.'s educational attorney reported to the court, "[w]e have continued our attempts to engage [R.W.]'s parent, [Mother], with no success. The parent has stated she wants nothing to do with us." In September 2006, the educational attorney suggested the court appoint a responsible adult to make educational decisions on R.W.'s behalf "given [Mother's] inconsistent cooperation in matters related to the minor's education."
In February 2008, soon after R.W. had been returned to Orangewood, her educational attorney requested an "emergency, expanded IEP team meeting be convened as soon as possible so as to request that the minor be assessed to assure [R.W.] is receiving appropriate services" including mental health services ranging from outpatient to residential treatment. R.W.'s educational *1273 attorney conferred with Mother, who indicated she would consent to the evaluation.
The social worker reported in March 2008, "[R.W.]'s behavior makes her impossible to place without the assistance of AB3632.[2] Since [R.W.] was returned to Orangewood Children's Home on January 25, 2008, [she] has had incidents requiring the intervention of the Orange County Sheriff. She was restrained once, tossed over the tables once and once threw food at staff."
An IEP team meeting to initiate an Assembly Bill No. 3632 (1983-1984 Reg. Sess.) placement was conducted in March 2008. Mother was notified of the meeting but did not participate. R.W.'s educational attorney reported, "[R.W.] is now being evaluated for placement within an RTC [residential treatment center] where she could be afforded a therapeutic milieu to more effectively deal with her mental health needs. The assessment/placement process . . . could take up to 90 days." During the meeting, a possible placement at Girl's and Boy's Town in Trabuco Canyon was discussed. The social worker contacted Girl's and Boy's Town and was informed it had no openings. At that time, R.W. was receiving individual therapy and psychiatric treatment, had a full "Wraparound team," was attending school at Orangewood, and was to receive an Assembly Bill No. 3632 evaluation.
In April 2008, R.W.'s educational attorney reported that Mother agreed with the decision to conduct a mental health assessment of R.W. to determine whether a residential treatment center placement would be warranted. Mother remained opposed to the appointment of a responsible adult to make educational *1274 decisions. Dr. Pamela Berg of the Orange County Health Care Agency was assigned to perform R.W.'s mental health status examination.

Potential Placement at the Cathedral Home
R.W.'s court-appointed special advocate (CASA) reported in April 2008: "I am very concerned for R[.W.] regarding permanency. She has been in the system for almost 8 years and has experienced ten unsuccessful placements, not including stays at O[rangewood]. R[.W.]'s behavior and emotional instability have contributed to the loss of these placements; however, she has greatly improved in her ability to have relationships and she has the ability and desire to have a successful placement at this point in her life and growth." R.W.'s social worker reported that R.W. had "two unresolved delinquency issues that are a product of two separate assault and battery charges pending against her, one that occurred in July of 2007 and one that occurred in August of 2007."
R.W.'s mental health assessment, dated May 19, 2008, provided this clinical summary: "R[.]W[.] was referred to [Children and Youth Services] for mental health assessment . . . due to concerns including an inability to maintain in a living situation for any length of time, difficulty making friends, bouts of depression, and a history of physically aggressive behavior. Since 2001 she has lived in at least eight group homes, two foster homes, with relatives, at O[rangewood], and in addition had two psychiatric hospitalizations, one due to physical aggression. R[.W.] has had behavior problems at school at least since kindergarten when first qualified for Special Education due to Emotional Disturbance. Despite outpatient psychotherapy, medication monitoring, and Wraparound support, R[.W.] has been unable to remain in a stable living environment. She appears to be most successful when in a highly structured and contained environment."
In June 2008, R.W.'s social worker reported R.W.'s behavioral problems continued to manifest themselves in assaults, property destruction, and murder threats. R.W. was "becoming frustrated" with living at Orangewood, and in May and June, three special incident reports involving R.W.'s behavior had been sent to the juvenile court.
R.W.'s IEP team met on June 12, 2008, to hear Dr. Berg's report and recommendation. Dr. Berg discussed the results of her assessment and recommended residential treatment placement for R.W. A representative of Cathedral Home interviewed R.W. and believed she "would be a good match for his program." Dr. Berg intended to recommend R.W.'s placement at Cathedral Home at the next IEP team meeting.
*1275 R.W.'s IEP team met again on June 30, 2008. Mother participated by telephone. Notes from the meeting stated: "Per Dr. Berg a search began in California, two placements were sent packets[,] Oak Grove within . . . San Bernardino County and Mar Vista within the County of San Diego. However, R[.W.] was not accepted within these placements as a result [of] not being a good fit for the home and also due to aggression, and chronic nature of [her] behavior. No other placements in California are available at this time. Therefore, OCHCA [Orange County Health Care Agency] had to look outside of California. Cinnamon Hills and Cathe[]dral Home were both sent packets and the current placement recommendation for R[.W.] is for Cathedral Home in Laramie[,] Wyoming." During the meeting, Mother expressed opposition to this recommendation.
In a report to the court of the June 30 meeting, R.W.'s educational attorney expressed her opinion that Mother's "recent activism" and "sudden reversal of opinion as to [R.W.]'s mental health needs is not in [R.W.]'s best interest." As a result, the report stated, the educational attorney was requesting the court to limit Mother's educational rights and to appoint a responsible adult to make educational decisions.

Motion to Limit Parents' Educational Rights
In July 2008, R.W.'s educational attorney filed a motion to limit parents' rights to make educational decisions for R.W. and to appoint a responsible adult as educational representative. The motion also requested that "the Court modify the minor's current placement orders indicated [and] consent to the educational placement at the residential treatment center (RTC), Cathe[]dral Home, in Laramie, Wyoming."
The motion stated: "[R.W.] has a long history of emotional damage as is demonstrated by her extreme aggressive behavior towards others and her impulsivity that places herself and others at risk of great harm. Numerous venues of therapy have been attempted, all with limited to no success due to her multiple failed placements and the resultant limited ability to consistent therapeutic intervention. [¶] Her IEP team, including her mental health team, all support the recommended residential place[ment], as does her CASA and educational surrogate. It is clearly in her best interest to receive this comprehensive. . . milieu of therapy to address her many needs. . . . [¶] The only impediment now to her placement, is her parent's recent decision to withhold her consent."
*1276 A hearing on the motion was held in July 2008. Mother's attorney appeared and opposed the motion and out-of-state placement. When asked whether he wished to submit evidence, Mother's counsel stated, "[u]nfortunately, Your Honor, I have no additional information to offer to the court from my client, other than her objection to the loss of her educational rights."
At the conclusion of the hearing, the juvenile court granted the motion to limit parents' educational rights and appointed R.W.'s CASA as the adult responsible for making educational decisions. The court signed a separate consent order consenting to "the implementation of the 6/30/08 individual education plan (IEP) which specifies an AB2726/3632 residential treatment center (RTC) placement as the educational placement for the minor at the Cathedral Home RTC facility in Laramie, Wyoming."
At a 15-day review hearing on July 31, 2008, Mother's attorney reiterated Mother's objection to losing educational rights.
Mother timely appealed from the order limiting parents' educational rights and the "Consent Order" consenting to the IEP specifying placement at the Cathedral Home.

DISCUSSION

Legal Principles
(1) Parents have a constitutionally protected liberty interest in directing their children's education. (Prince v. Massachusetts (1944) 321 U.S. 158, 166 [88 L.Ed. 645, 64 S.Ct. 438]; see Jonathan L. v. Superior Court (2008) 165 Cal.App.4th 1074, 1102 [81 Cal.Rptr.3d 571].) However, when a child is a dependent child, a court may limit a parent's ability to make educational decisions on the child's behalf by appointing a responsible adult to make educational decisions. (Welf. & Inst. Code, § 361, subd. (a); Cal. Rules of Court, rule 5.650(a).)
"If the parent or guardian is unwilling or unable to participate in making an educational decision for his or her child, or if other circumstances exist that compromise the ability of the parent or guardian to make educational decisions for the child, the county welfare department or social worker shall consider whether the right of the parent or guardian to make educational decisions for the child should be limited." (Welf. & Inst. Code, § 366.1, subd. (e).) A court-imposed limitation on a parent's educational rights "may not exceed those necessary to protect the child." (Id., § 361, subd. (a).)
*1277 In addition, "the court may make any and all reasonable orders for the care, supervision, custody, conduct, maintenance, and support of the [dependent] child, including medical treatment, subject to further order of the court." (Welf. & Inst. Code, § 362, subd. (a).)

The Juvenile Court Did Not Abuse Its Discretion
We review the juvenile court's order limiting parents' educational rights under an abuse of discretion standard (In re Stephanie M. (1994) 7 Cal.4th 295, 318-319 [27 Cal.Rptr.2d 595, 867 P.2d 706]), bearing in mind "[t]he focus of dependency proceedings is on the child, not the parent" (In re Hadley B. (2007) 148 Cal.App.4th 1041, 1048 [56 Cal.Rptr.3d 234]). We conclude the juvenile court did not abuse its discretion in granting the motion to limit parents' educational rights and making the "Consent Order" consenting to R.W.'s placement at the Cathedral Home in Laramie, Wyoming.
Mother argues the evidence was insufficient to establish an order limiting parents' educational rights was necessary to protect R.W. Mother contends the motion was "based on the simple fact that . . . [M]other disagreed with the recommendation in her daughter's IEP and AB3632 assessment that R[.W.] should be placed in Cathedral Home in Laramie, Wyoming."
(2) The evidence amply supported the juvenile court's decision. When the motion to limit parents' educational rights was filed, R.W. was 16 years old and had been in the dependency system for seven years. Over those entire seven years, R.W. had suffered from severe emotional and behavioral problems that periodically manifested themselves in aggressive behavior and violent outbursts. As a result, several placements failed, and R.W. became the subject of two separate assault and battery charges in the delinquency system. R.W. was becoming understandably frustrated with living at Orangewood. She had special mental health and educational needs requiring urgent treatment that had not been provided through any of her many placements. The motion to limit parental educational rights noted the "window of opportunity for meaningful therapeutic intervention is closing."
Contrary to Mother's assertion, the evidence submitted with the motion to limit parents' educational rights showed a great deal of effort had been made to find a suitable placement for R.W. in California, but none was available. The options were limited: To assure R.W. received necessary educational and mental health services, she needed to be placed in "a highly structured and contained environment." There were no openings at Girl's and Boy's Town, and R.W. had not been accepted at homes in San Bernardino and San Diego *1278 Counties. A representative of the Cathedral Home met with R.W. and believed she would be a good match for its program.
R.W.'s IEP team, mental health team, CASA, educational attorney, and trial counsel all agreed R.W. should be placed at the Cathedral Home. Only Mother disagreed, but she had never shown good judgment in making decisions affecting R.W. Mother had been deemed an unfit parent, and her reunification services had been terminated. R.W.'s trial 60-day stay with Mother ended because Mother left R.W. with the maternal grandparent while away in Las Vegas. R.W. allegedly suffered abuse at the maternal grandmother's house and ended up in the hospital.
Mother argues the motion to limit parents' educational rights was filed the same day as the hearing on the motion, and her attorney therefore "lacked adequate time and ability to confer with . . . [M]other." The record demonstrates Mother had the opportunity to express her opposition to the motion. At the hearing on July 17, 2008, Mother's counsel stated Mother had contacted his office and wanted him to object to the motion on the record. Mother's attorney again expressed opposition at the next 15-day review hearing on July 31. Mother does not contend she wanted to present evidence or testify at the hearing.
Mother contends her opposition to placing R.W. at the Cathedral Home was not "arbitrary or unreasonable" because Mother was "simply opposed to moving her daughter out of California to a placement in Wyoming far away from her family and her CASA." The issue before us is whether the juvenile court abused its discretion, not whether Mother's opposition was reasonable. Moreover, the record shows Mother was inconsistent in her visits and interaction with R.W. and did not make good decisions regarding her upbringing. R.W.'s brother and sister had not visited R.W. since her placement with them ended abruptly and sadly in January 2008. R.W.'s CASA supported placing R.W. at the Cathedral Home. The potential benefit of placing R.W. at the Cathedral Home far outweighs the loss of any support she might receive from her family.
Mother's opposition to the recommendation to place R.W. at the Cathedral Home was not in R.W.'s best interest. While Mother's opposition might have made it necessary to bring the motion to limit parents' educational rights, the motion was based on the urgent need to address R.W.'s emotional, behavioral, and educational needs before the "window of opportunity" shut tight.

*1279 DISPOSITION
The order limiting parents' educational rights and the "Consent Order" consenting to the IEP recommendation to place R.W. at the Cathedral Home are affirmed.
Rylaarsdam, Acting P. J., and Aronson, J., concurred.
NOTES
[1] "An IEP is a comprehensive statement of a disabled child's educational needs and the specifically designed instruction and related services that will meet those needs. [Citation.] It is developed by a school official qualified in special education, the child's teacher, and the parents. [Citation.] It guides the school system as to how the child will be educated. However, parents may disregard the IEP and educate their child in a manner different from that specified by the IEP. [Citations.]" (In re Carl R. (2005) 128 Cal.App.4th 1051, 1067 [27 Cal.Rptr.3d 612], fn. omitted.) "[A]n IEP is reviewed at least annually and revised as necessary." (Ibid., citing 20 U.S.C. § 1414(d)(4).)
[2] "`A[ssembly] B[ill No.] 3632' refers to the adoption of what is now chapter 26.5 of division 7 of title I of the Government Code, section 7570 et seq., entitled `Interagency Responsibilities for Providing Services to Children With Disabilities.'" (Grossmont Union High School Dist. v. State Dept. of Education (2008) 169 Cal.App.4th 869, 880 [86 Cal.Rptr.3d 890].) "AB 3632" is the name commonly used for the program setting forth interagency responsibilities for providing services to handicapped children. (County of San Diego v. Cal. Special Educ. Hearing (9th Cir. 1996) 93 F.3d 1458, 1463, fn. 2.) California's State Department of Mental Health's Web site states: "The federal Individuals with Disabilities Act (IDEA) ensures that children with disabilities are entitled to a free, appropriate public education in the least restrictive environment. Special education pupils who require mental health services in any of the 13 disability categories may receive services from county mental health programs. To be eligible to receive services, they must have a current individualized education plan (IEP) on file. The services must align with the child's needs as identified in the IEP and are designed so that children will benefit from their educational programs. They are free to all eligible students regardless of family income or resources." ( [as of Mar. 26, 2009].)