Filed 6/20/13  In re D.R. CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re D.R., a Person Coming Under the Juvenile Court Law. | B245103 (Los Angeles County Super. Ct. No. CK 07610) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>T.T.,<br><br>    Defendant and Appellant. | |

APPEAL from an order of the Superior Court for the County of Los Angeles. Elizabeth Kim, Juvenile Court Referee.  Affirmed.

Amy Z. Tobin, under appointment by the Court of Appeal, for Defendant and Appellant.

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, and William D. Thetford, Principal Deputy County Counsel, for Plaintiff and Respondent.

_____

## SUMMARY

The mother in this juvenile dependency proceeding is incarcerated in state prison until at least 2025. She seeks reversal of the juvenile court's order limiting her right to make educational decisions for her child, D.R. We find no abuse of discretion and affirm the order.

## FACTS

Mother T.T. was incarcerated in 2009. Her two children, D.R. (eight years old) and B.C. (17 years old) came to the attention of the juvenile court in December 2011. In February 2012, the juvenile court sustained allegations that mother "is incarcerated and is unable to make an appropriate plan for the children's ongoing care and supervision," thus endangering the children's physical health and safety and creating a detrimental home environment.

No reunification services were ordered. The court found the children were not proper subjects for adoption and had no one willing to accept legal guardianship. The court ordered a permanent plan of "placement with a relative, with a specific goal of independent living with identification of a caring adult to serve as a lifelong connection for the youth . . . ."

This appeal relates only to D.R., who wanted to live with his adult sibling, Lorenzo C., but Lorenzo did not qualify to have D.R. placed with him. D.R. thus went through a number of placements that were unsuccessful for one reason or another, and during which he exhibited serious behavioral problems and, at times, refused to attend school. D.R. told the Los Angeles County Department of Children and Family Services he felt "sad that he was repeatedly replaced and did not want to adjust to placement fearing he would have to [be] replaced again." When asked for "reasons he refuses to attend school or do well in placement," he said "there was no point to him behaving as he would eventually be replaced."

The record of D.R.'s numerous placements, his serious behavioral problems, and his schooling is as follows.

On January 5, 2012, D.R. was placed in a foster home. At that time, the social worker reported "symptoms of crying spells, severe temper tantrums, separation anxiety, sadness, which occur at school when [D.R.] is separated from [Lorenzo]," and D.R. reported "difficulty concentrating at school" and "difficulty adjusting at his school." The person who referred D.R. and B.C. to the Department in November 2011 stated D.R. had been "out of school" since his mother's incarceration in 2009. As of mid-December 2011, D.R. was a second grader at a Compton elementary school, but his attendance was poor; he had been enrolled for 26 days, was present at school 15 days and had 11 unexcused absences. The school reported D.R. cried when brought to school, "does not appear to want to stay in school," "throws himself on the floor and has begun throwing up in response to being brought to school."

In late February, D.R. was released to a maternal aunt, Cecilia S., on an extended visit pending approval of placement with her.

Three months later, in late May 2012, D.R. was diagnosed with oppositional defiant disorder and reactive attachment disorder. His initial assessment indicated D.R.'s behaviors included refusing to follow commands, throwing things, often losing his temper, "attempting to hit people in [the] head [with] glass bottles, wrenches, or other objects," and that he was "hyperactive at school and disrupting the class." His therapist's report in late May indicated police had been called on several occasions because D.R. "often becomes extremely aggressive," most recently trying to hit another child in the home with a large object. The report also indicated D.R. "has auditory hallucinations when he becomes very angry" (including an "angry voice" that "allowed him to go outside and get a stick . . . to hit his [caregiver's] grandson, who had made him upset"). D.R. was "having angry outbursts at school" and had been recently suspended from an after school program.

In mid-August, Cecilia S. advised the Department she intended to have the court remove D.R. from her home. The Department's status report said D.R.'s "behavior in the last 2 months has been a challenge for [Cecilia], but more than anything, [Cecilia] feels she can no longer accommodate the demands of the family" and "would not allow the

3

relatives to 'run her household'." The Department's report, like the therapist's May report, indicated that D.R.'s behavior had "escalated to the point where [Cecilia] has to contact law enforcement to restore order in her home," finding it "increasingly difficult to manage [D.R.'s] behaviors without the support of law enforcement and mental health personnel."

But the Department also reported (and school records showed) that as of mid-August, D.R. was "attending school on a regular basis." D.R. was "engaged in age-appropriate programs outside of the school setting," had completed the third grade at another elementary school, and would be in the fourth grade in the fall of 2012. His grades showed he was "partially proficient" in most subjects, proficient in health education and arts, and advanced in physical education.

On September 5, 2012, mother filed papers, including an eight-page handwritten letter, opposing the use of any type of psychotropic medication for D.R.

On September 10, 2012, after D.R. was removed from maternal aunt's home and placed in foster care, the foster parents requested his removal due to behavioral issues, including tantrums, throwing objects, refusal to take prescribed medications and refusal to attend school.

On October 4, 2012, D.R. was placed with L.D., a paternal aunt of D.R.'s sister. A week or so later, L.D. advised the Department she could not keep D.R. in her care because children were not permitted in her building and her section 8 housing would be jeopardized. On October 22, L.D. delivered D.R. to the Department with his personal belongings; D.R. was unaware that he would no longer be residing with her, and was upset when he learned about it. The next day, D.R. was placed in the foster home of E.S.

On October 29, 2012, after finding D.R. had educational needs that were not being met, the juvenile court limited mother's educational rights, over the objection of mother's counsel. The court ordered D.R.'s counsel "to prepare the paperwork, whether it is the adult sibling, the caretaker, or the former caretaker, the adult sibling or CASA [(court-appointed special advocate)] or another surrogate, but we need to make sure that [D.R.'s] educational needs are being met."

4

Findings and orders limiting mother's right to make education decisions were filed on November 5, 2012. E.S., D.R.'s then-current foster parent, was appointed D.R.'s educational representative. The orders also stated that D.R. "has the following educational and developmental needs" – "The child is age 3 years or older and is suspected of having a disability."

Two days later, D.R. was hospitalized at a psychiatric hospital for three weeks. Then, on November 28, 2012, he was placed with "D-rate foster caregiver Martha R." (According to the Department's web site, a D-rate caregiver provides care for children with special needs.)

Mother filed a timely appeal from the court's October 29, 2012 order limiting her educational rights over D.R.

## DISCUSSION

Parents have a constitutionally protected right to control the education of their children. (*Troxel v. Granville* (2000) 530 U.S. 57, 65; *In re R.W.* (2009) 172 Cal.App.4th 1268, 1276 (*R.W.*).) Where the child has been declared a dependent of the court under Welfare and Institutions Code section 300, however, the juvenile court may limit a parent's right to make educational decisions for the child. (§ 361, subd. (a)(1).) Any limitations on a parent's right to make educational decisions "may not exceed those necessary to protect the child," and the court must at the same time "appoint a responsible adult to make educational . . . decisions for the child . . . ." (*Ibid.*; see also § 366.3, subd. (e)(5) [at review hearings the reviewing body "shall determine . . . . [¶] . . . [¶] . . . [w]hether there should be any limitation on the right of the parent . . . to make educational decisions . . . for the child," and that limitation "may not exceed what is necessary to protect the child"]; Cal. Rules of Court, rule 5.650(a) ["The court may limit a parent's or guardian's educational rights regardless of whether the child is, or may be eligible for, special education and related services."].)

We review the juvenile court's order limiting mother's educational rights for abuse of discretion. (*R.W., supra,* 172 Cal.App.4th at p. 1277; see *In re Stephanie M.* (1994) 7 Cal.4th 295, 318-319 ["And we have recently warned: '"The appropriate test

5

for abuse of discretion is whether the trial court exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court.""""].)

Mother argues her right to make educational decisions for her child cannot be limited "simply because of incarceration" and that, because the limitation must be "necessary to protect the child" (Welf. & Inst. Code, § 361, subd. (a)(1)), "there must be some showing that . . . a parent is unable or unwilling to adequately address the minor's educational needs." While conceding D.R.'s behavior was "problematic," mother insists there was no evidence D.R.'s educational needs were not being met. She cites *R.W.*, where the court upheld a limitation on the mother's educational rights, and points out how different the facts were in that case (where the minor was moved 18 times, changed schools numerous times, had severe emotional problems and dangerous behavior, required urgent treatment, and the mother, who had never shown good judgment, refused to consent to an educational placement out of state). (*R.W., supra,* 172 Cal.App.4th at pp. 1271, 1277-1278.) But the absence of facts identical to those in *R.W.* is simply not relevant – the question is whether the limitation on educational rights was "necessary to protect the child." (§ 361, subd. (a)(1).)

We see no abuse of discretion by the juvenile court. While it is true that as of mid-August, D.R. finally was attending school regularly and getting acceptable grades, he indisputably had a history of severe behavioral problems – and almost immediately after the mid-August report, in September, D.R. was again refusing to attend school. While the fact of incarceration may not be sufficient in all cases to justify limiting an incarcerated parent's right to make educational decisions, there is much more here than mere incarceration. Mother has been in prison since 2009 and will be in prison until D.R. is an adult. As of mid-August 2012, mother had not spoken with D.R. for the previous six months. There was evidence D.R. had not been attending school at all when he first came to the Department's attention in November 2011, and he had once again reverted to refusing to attend school in September 2012. At various times, his behavior has been

"extremely aggressive," he has been "hyperactive at school and disrupting the class," and he has had auditory hallucinations and "angry outbursts at school."

Under these circumstances, it was reasonable for the juvenile court to conclude mother was not in a position to make the educational decisions for D.R. The juvenile court did not abuse its discretion in determining that limitation of mother's right to make educational decisions, and the appointment of another responsible adult to make those decisions, was "necessary to protect the child." (Welf. & Inst. Code, § 361, subd. (a)(1).)

## DISPOSITION

The order is affirmed.

GRIMES, J.

We concur:

BIGELOW, P. J.

FLIER, J.