Filed 6/13/24  In re M.M. CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re M.M., a Person Coming Under the Juvenile Court Law. | B328908, consolidated with B329901 (Los Angeles County Super. Ct. No. 22CCJP03441A) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>Michael M.,<br><br>Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Craig S. Barnes, Judge. Affirmed with directions.

Jesse Frederic Rodriguez and Giselle Marie Achecar, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Navid Nakhjavani, Principal Deputy County Counsel, for Plaintiff and Respondent.

\* \* \* \* \* \*

In this juvenile dependency case, Michael M. (father)[1] challenges the juvenile court's exertion of jurisdiction over his teenage daughter, its order removing her from his custody, and its order granting Tiffany B. (mother) and the caregiver co-educational rights over the daughter. Concluding there was no error, we affirm but direct the juvenile court to enter its educational rights order on a JV-535 form.

## FACTS AND PROCEDURAL BACKGROUND

### I.     The Family

M.M. was born to mother and an unknown man in February 2008.

In December 2016, the family court granted father full legal and physical custody over M.M.

Although a DNA test confirmed that father is not M.M.'s biological father, the juvenile court ruled that he is her presumed father.

---

1     Father now uses the name Brother M.

## II.    "Whoopings" and Isolation

Father openly admitted to "whooping" M.M. with a leather belt on more than one occasion.  He did it at least one time when she was 11 or 12 years old.  He did it again in August 2022, when she was 14 years old.  In the August 2022 incident, father became "outrage[d]" and "angry" when M.M. was texting mother on a cell phone; he proceeded to give her a "whooping" by "lashing" her five times on the buttocks, leg, and back with a leather belt.  After each of the first four lashes he explained why he was whooping her, and described the fifth lash as "one to grow on."  Father converted to Islam in 2018 and is a sheik of the Moorish Science Temple of America.  He explained that he "obey[s] the ordinance of Allah."  When asked why he repeatedly lashed M.M. with a belt, father further explained that M.M. needed to "return back to the Divine Creed of her ancient mothers and fathers and regain the true love of Allah."

Father also isolated M.M. from "worldly activities and worldly things" as a way to remove her from "anything that causes harm."  M.M. attended school in person prior to the COVID-19 pandemic, but father did not permit her to be vaccinated so she completed the seventh and eighth grades through remote learning.

## III.   Dependency Petition

On September 1, 2022, the Los Angeles County Department of Children and Family Services (the Department) filed a petition asking the juvenile court to exert dependency jurisdiction over M.M. on the basis of the August 2022 lashings as well as other beatings M.M. reported receiving, all of which placed her at substantial risk of serious physical harm.  The petition alleged that jurisdiction was appropriate under

3

subdivisions (a) and (b)(1) of section 300 of the Welfare and Institutions Code.[2]

## IV. Jurisdictional Hearing

The juvenile court conducted a two-day evidentiary hearing in December 2022 and January 2023, at which father and M.M. testified. M.M. reported frequent, twice weekly beatings by father. Father disputed using a belt on M.M. with such frequency, and expressed his view that M.M. was exaggerating because she no longer wanted to live with him. Father was concerned about the lack of discipline in society and cited his belief that "the rod of correction shall drive the foolishness away from the heart[, that h]e who loves his [child] will be careful to discipline [them, and that] he who hates this child spares the rod," and "so as a part of that love . . . [w]e have to impart discipline."

The juvenile court did not credit M.M.'s testimony about the frequency of beatings, but found that there had been at least two beatings with a belt based on father's own admissions. The court found father generally credible, except for the "parts where" father "understated" "the depths of his anger." In light of these findings, the court ruled that father's use of the belt constituted "inappropriate" physical discipline that was neither "reasonable" nor "appropriate." The court accordingly dismissed the allegation under subdivision (a) of section 300, but sustained the allegation under subdivision (b) of section 300 once it was amended to reflect that father had "inappropriately disciplined" M.M. "by striking the child's leg and back with a belt" on more than one occasion, which was "not reasonably necessary."

---

[2] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

## V.    Dispositional Hearing

Father resisted the juvenile court's jurisdictional ruling. He immediately filed a section 388 petition attacking the ruling, which the court denied.  Father also ignored the court's interim order for father not to contact daughter by going to M.M.'s high school; while there, father displayed anger at the school officials.

The juvenile court held its dispositional hearing in April 2023.  The court removed M.M. from father's and mother's custody, and ordered that she remain in the custody of Ms. J., in whose custody she had been since August 2022, with father to have monitored visitation.  The court ordered reunification services for father, ordering him to complete (1) parenting classes, (2) individual counseling to address case issues including domestic violence, and (3) conjoint counseling with M.M. if M.M.'s therapist so recommended.

## VI.    Hearing on Educational Rights

In early June 2023, the juvenile court held a two-day hearing regarding who should possess the rights to control M.M.'s education.  M.M. had by that time been attending a high school for nine months and was starting to make academic and social progress; the court designated that high school to be her "school of origin."  The court named both mother and father as co-holders of the decisionmaking rights over M.M.'s education, finding that it was in M.M.'s best interest to have *both* parents "involved." Because father wished to enroll M.M. in a different high school and because the court found it was in M.M.'s best interest for her to remain where she was attending, the court granted the caregiver Ms. J. co-holder rights for purposes of "tie breaking authority" only as to which high school M.M. attended.  The court told the parents to bring any other decision on which they could

not agree to the court. The court rejected father's concern that the high school was a haven of drugs and gang-related activity after assuring itself that the school—and the one father preferred—each had "zero tolerance" policies for drugs and gang activity.

## VII.  Appeals

Father timely appealed from the jurisdictional and dispositional orders and the post-dispositional order regarding educational rights. We consolidated the two appeals.

**DISCUSSION**

## I.  Jurisdictional Finding

Section 300, subdivision (b)(1), authorizes a juvenile court to exert dependency jurisdiction over a child if the child "has suffered, or there is a substantial likelihood that the child will suffer, serious physical harm or illness, as a result of . . . [t]he failure or inability of the child's parent . . . to adequately supervise or protect the child." (§ 300, subd. (b)(1).) We review the juvenile court's jurisdictional findings for substantial evidence. (*In re I.J.* (2013) 56 Cal.4th 766, 773.)

Substantial evidence supports the juvenile court's finding that M.M. had previously suffered serious physical harm. "Serious physical harm" excludes the exercise of a parent's right to reasonably discipline their child. (*In re D.M.* (2015) 242 Cal.App.4th 634, 640-641.) "Whether a parent's use of discipline on a particular occasion falls within (or instead exceeds) the scope of this parental right to discipline turns on three considerations: (1) whether the parent's conduct is genuinely disciplinary; (2) whether the punishment is 'necess[ary]' (that is, whether the discipline was 'warranted by the circumstances'); and (3) 'whether the amount of punishment was reasonable or

6

excessive.'" (*Id.* at p. 641.) Here, father admitted he was "angry" when he "whoop[ed]" M.M. in August 2022, and the court specifically found that father was understating the depths of his anger. A beating inflicted out of anger is not "genuinely disciplinary" (under the first element of *D.M.*'s test). The court also found that whipping M.M. with a belt on her back and leg was not "necessary" or "reasonable" (implicating the second two elements). Dependency jurisdiction has been upheld when a parent hit a three year old with a belt causing bruises for refusing to write a letter of the alphabet and spraying perfume in his eyes (*In re Mariah T.* (2008) 159 Cal.App.4th 428, 438-439) and when a parent hit a minor with a belt and electric cord hard enough to leave welts due to misbehavior (*In re David H.* (2008) 165 Cal.App.4th 1626, 1645). This case is similar, where father most recently lashed M.M. repeatedly with a belt when he discovered text messages and images on her cell phone. Father resists this conclusion, urging that there was no evidence that his beating of M.M. caused her bruises or welts, but M.M. testified that the beatings caused bruises and parts of her body to swell. Father also urges the juvenile court here did not apply *D.M.*'s test, but the court's express reference to father's anger and to the necessity and appropriateness of the discipline echo the elements of that test. Father lastly urges that the court's decision to dismiss the allegation of "physical abuse" under subdivision (a) while interlineating the allegation under subdivision (b) to "inappropriate discipline" undermines the court's ruling. It does not: *D.M.*'s test refines when parental discipline crosses the line into actionable "serious physical harm" within the meaning of section 300; the court's decision here to use the phrase "inappropriate discipline" rather than "physical abuse" does not

7

negate the legal significance of its determination under the test that M.M. suffered "serious physical harm."

Substantial evidence also supports the juvenile court's finding that M.M. continued to face a "substantial risk" of serious physical harm. Father testified that "the rod of correction" was an integral part of his parenting philosophy; he had stated that he would discipline M.M. for running away from home, an act for which father had not yet disciplined her. This constitutes an ample factual basis from which the court could find father might lash her again in the future. Father responds that he had not physically disciplined her in the six months prior to the jurisdictional hearing, but that was because she was in Ms. J.'s custody, not father's; that father did not do what he had no opportunity to do says very little. Father also assured the court that he would not "whoop" her in the future, but the juvenile court was well within its rights to discount that assurance in light of father's prior conduct and statements.

Father lastly urges that M.M.'s testimony that she feared father was substantially impeached by text messages she sent to mother, but M.M.'s fear or lack of fear has no bearing on the pertinent analysis.

## II.    Removal Order

Once a juvenile court exerts dependency jurisdiction over a child, the court may remove the child from her parent if it finds, by clear and convincing evidence, that (1) "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the [child] if the [child] were returned home," and (2) "there are no reasonable means" short of removal "by which the [child's] physical health can be protected." (§ 361, subd. (c)(1); Cal. Rules of Court, rule 5.695(c)(1).) We

review a removal order by asking whether substantial evidence supports the juvenile court's finding, by clear and convincing evidence, that removal was appropriate. (*In re V.L.* (2020) 54 Cal.App.5th 147, 155.)

Substantial evidence supports the juvenile court's removal finding in this case. Father has repeatedly reaffirmed his deep belief in the divine propriety of physically discipling children and has indicated that he has yet to discipline M.M. for running away from home after the August 2022 beating; this poses a "substantial danger" to her physical health, safety, and well-being if she were returned to his custody. The juvenile court was within its rights to disregard father's subsequent assurances that he would not physically beat her in the future. Father also admitted to isolating M.M. from the world, which she testified has harmed her emotional well-being. The court's related finding that no reasonable means short of removal could assure M.M.'s safety is also supported by substantial evidence. Citing *In re Henry V.* (2004) 119 Cal.App.4th 522, 529-530, father suggests that unannounced visits by the Department would suffice; we disagree, as they would not protect M.M. unless they occurred all the time because father and M.M. appear to be at loggerheads, the beatings have occurred more than once, and father has yet to demonstrate adherence to his newfound disavowal of the propriety of physical punishment. (Cf. *Henry V.*, at pp. 529-530 [unannounced visits may be a viable alternative to check on bruises due to excessive child discipline, at least where discipline is a one-time incident and the parent has embraced counseling].) Unannounced visits also would not protect M.M. from the emotional harm of being wholly isolated.

Father resists this conclusion with two further arguments.

First, he argues that the earlier beatings are insufficient to warrant removal, which looks toward whether being in his custody in the future will cause harm. (*In re Kieshia E.* (1993) 6 Cal.4th 68, 77.) Father correctly states the rule, but the juvenile court's removal finding *did* look toward the substantial danger that being in father's custody might pose to M.M. in the future.

Second, he argues that M.M. is not in any danger because the root problem is M.M. herself, whom father describes as "rebellious, dishonest, incorrigible, [and] selfish" and who is willing to do anything not to be "parented by father's lifestyle and rules." Father's character assassination of M.M. ignores the pertinent inquiry, which is whether father's self-admitted history of physically beating M.M. places her in substantial danger until such time as he demonstrates an ability to stop.

## III.   Educational Rights Order

Once a juvenile court exerts dependency jurisdiction over a child, the court "may limit" any parent's "right . . . to make educational . . . decisions for the child." (§ 361, subd. (a)(1).) Limits are valid as long as they do "not exceed those necessary to protect the child" and ensure that the ensuing decisions are "based on the best interests of the child." (§ 361., subds. (a)(1) & (a)(6); Cal. Rules of Court, rule 5.649(a); *In re R.W.* (2009) 172 Cal.App.4th 1268, 1276; *In re D.C.* (2015) 243 Cal.App.4th 41, 58-59, superseded by statute on other grounds as stated in *In re A.M.* (2020) 47 Cal.App.5th 303, 322; *In re Samuel G.* (2009) 174 Cal.App.4th 502, 511.) Factors relevant to whether an order is in a child's best interests are (1) the child's wishes (see *In re Aljamie D.* (2000) 84 Cal.App.4th 424, 432), and (2) whether the parent has been harassing school officials (*D.C.*, at pp. 58-59). We review an order limiting a parent's rights for an abuse of

10

discretion. (*R.W.*, at p. 1277.)

The juvenile court did not abuse its discretion in making father and mother co-holders of educational rights over M.M., or in granting the caregiver Ms. J. "tie breaking authority" solely over the decision of which high school M.M. would attend. As a threshold matter, it is unclear whether the court's order "limits" father's educational rights; although he had *sole* legal custody over M.M. prior to the initiation of this dependency case, any decisions on which the parents now disagree—except for the choice of her high school—are to be brought back to the court for resolution; because the court would have supervision over those decisions by virtue of its jurisdiction over M.M.—even if father were the sole person making them—the court's order does not appear to place any limits on father's rights as to those decisions. Putting this to the side, the court in any event found it necessary to protect M.M.'s emotional well-being given the isolation she had suffered and the progress she was beginning to make at her high school as well as the need for stability that would be undercut if she were forced to transfer to the school father preferred. The court also found it in M.M.'s best interests for *both* of her parents to be "involved" in those decisions. In granting the caregiver "tie breaking authority," the court found that M.M. wished to continue where she was attending and was making strides there; father's belligerent harassment of school officials in the past reinforced the need to allow the caregiver tie-breaking input.

Father responds with what boil down to four arguments.

First, he argues that we must reverse because the juvenile court never articulated the "necessity" and "best interests" standard. Father says that we must therefore infer the court applied the wrong standard. Father has it backwards; we

11

construe a juvenile court's silence as evincing a proper understanding and application of the law—not, as father would suggest, as evincing a misunderstanding and misapplication of the law. (*In re Julian R.* (2009) 47 Cal.4th 487, 498-499; *In re Johnson* (1965) 62 Cal.2d 325, 330; see generally, Evid. Code, § 664.)

Second, father challenges the necessity of allowing M.M. to remain at her high school because it is not in M.M.'s best interests to allow her to "make choices that enable her to use drugs and associate with gangs" simply because "those choices make her happy." Once again, this character assassination ignores the juvenile court's explanation as to why it was necessary and better for M.M. to remain where she was attending. It also ignores the juvenile court's inquiry into the anti-drug and anti-gang policies at the high school.

Third, father argues that it is impermissible for educational decisionmaking rights to be held by more than one person or for them to be granted to a non-parent. This argument directly contradicts father's concessions to the juvenile court that those rights could be granted to more than one person and to a non-parent. At best father has waived these alleged errors; at worst, he has invited them. They are not errors in any event, as the pertinent statutes contemplate than any "responsible adult" may hold educational rights over a child and nowhere prohibit the sharing of those rights. (§ 361, subds. (a)(1), (a)(4)(A).)

Fourth and finally, father argues that the court erred in not placing its findings on a JV-535 form. This is certainly required. (Cal. Rules of Court, rule 5.650(a), 5.649(a), (e).) The juvenile court was aware of this requirement, repeatedly discussed with the parents what language should be used in the JV-535 form,

12

and ordered minor's counsel to prepare one.  No JV-535 form appears in the record on appeal.  The absence of this form is of no moment because father has not shown how it was prejudicial given that the court's minute order spelled out all the pertinent information that would have been included in an order prepared with that form.

We direct the juvenile court to memorialize its order in a JV-535 form.

## DISPOSITION

The juvenile court's orders are affirmed.  The juvenile court is directed to memorialize its educational rights order on a JV-535 form.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, J.
HOFFSTADT


We concur:


_____, P. J.
LUI


_____, J.
ASHMANN-GERST