Filed 5/20/19

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| B.H., | B281864 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC593775) |
| v. | |
| MANHATTAN BEACH UNIFIED SCHOOL DISTRICT, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Teresa Sanchez–Gordon, Judge. Reversed.

Grey & Grey and David M. Grey for Plaintiff and Appellant.

Fagen Friedman & Fulfrost, Lynn Beekman and Christopher J. Fernandes.

The essence of this appeal is whether a school district may be permitted to avoid its responsibility to provide special education and related services to an eligible student to fund the placement of a child with severe disabilities in a residential treatment center, where that placement was necessary to enable the child to access a meaningful educational benefit, because the child's adoptive parents happened also to have funding available for that residential placement through a noneducational governmental agency program.

Federal law creates a comprehensive framework for the provision of educational services to children with disabilities, under the Individuals with Disabilities Education Act (20 U.S.C. §§ 1400 et seq.; IDEA). Within the IDEA's framework in California, local education agencies under the responsibility of the state Department of Education are tasked with furnishing special education services to all eligible children at no cost to their parents or guardians. (20 U.S.C §§ 1401(9), (29), 1412(a)(1)(A); Ed. Code, §§ 56000, et. seq., esp. § 56040, subd. (a).) These statutory schemes guarantee a "free appropriate public education," commonly referred to as a "FAPE," for disabled students.[1]

Appellant B.H., a former foster child, has severe disabilities, and is eligible for special education and related services. His adoptive parents (Parents) reside within the geographical boundaries of respondent Manhattan Beach Unified School District (MBUSD). Generally, under the California scheme, the school district in which the parents of the disabled

---

[1]    In the literature and decisions discussing the IDEA, many important statutory terms are abbreviated using inelegant acronyms (FAPE is one) that to the uninitiated appear to be an alphabet soup of capitalized code. We will keep the use of such acronyms to the minimum necessary.

2

student reside is responsible for preparing an "individualized education plan," referred to as an "IEP," for the disabled child under the IDEA, and for paying for the costs of implementing that plan. (Ed. Code, §§ 48200, 56028.) Consistent with this rule, MBUSD prepared an IEP for B.H.

In the meantime, Parents arranged for B.H.'s placement, later agreed to by MBUSD and consistent with B.H.'s IEP, at a residential treatment center and its affiliated nonpublic school in Sonoma County. They received financial assistance for the placement through the Adoptive Assistance Program (AAP) administered by the Los Angeles County Department of Children and Family Services (DCFS). Such assistance is provided by the federal Adoption Assistance and Child Welfare Act of 1980 (42 U.S.C. § 670, et seq.) and implementing provisions of the Welfare and Institutions Code. Parents were entitled to such aid as the adoptive parents of a child formerly under the supervision of DCFS whose special needs preexisted his adoption.

After learning of the financial aid received by Parents, MBUSD refused to implement B.H.'s IEP and fund his placement in Sonoma County. MBUSD asserted that because Parents received funding through DCFS after the individual education plan was finalized, MBUSD was not responsible for the costs of B.H.'s education. Parents initiated an administrative hearing challenging MBUSD's decision. At issue was whether MBUSD was responsible for paying Parents' transportation costs related to the Sonoma County placement.

The administrative law judge sided with MBUSD. The judge ruled that MBUSD had not placed B.H. in the Sonoma County facility under MBUSD's individual education plan for B.H. Rather, the judge concluded that DCFS had, in effect, made the placement by requiring Parents to comply with certain eligibility criteria for financial assistance associated with the

3

placement, including proof that the Sonoma County facility qualified for AAP aid. The judge relied on Education Code sections 56155 and 56156.4, subdivision (a), which provide an exception to the general rule that the school district of the parents' residence is responsible for funding the costs of a disabled child's education. Under those provisions, if a disabled child is "placed in a licensed children's institution . . . by a court, regional center for the developmentally disabled, or *public agency, other than an educational agency*" (Ed. Code, § 56155, italics added), then the "special education local plan area [rather than the school district of the parents' residence] shall be responsible for providing appropriate education [to the child] residing in licensed children's institutions . . . located in the geographical area covered by the local plan" (Ed. Code, § 56156.4, subd. (a)).

The judge concluded that DCFS was a "public agency, other than an educational agency" under Education Code section 56155, that DCFS had placed B.H. in the Sonoma facility, and that therefore, under Education Code section 56156.4, subdivision (a), MBUSD was not responsible for the costs of MBUSD's education. (Implicitly, though not expressly stated, the judge's reasoning meant that the "special education local plan area" (Ed. Code, § 56156.4, subd. (a)), in Sonoma County in whose geographical boundaries B.H. was placed was responsible for the costs, though that agency was not a party to the proceedings.)

B.H. appealed to the superior court, which agreed with the administrative law judge. He has now appealed the trial court's decision to this court. We reverse. We hold that DCFS is not a "public agency, other than an educational agency" under Education Code section 56155, that DCFS did not "place" B.H. in the Sonoma facility by providing AAP assistance, and that therefore Education Code section 56156.4, subdivision (a), did not

4

provide MBUSD with an exception to the rule that the school district of the parents' residence is responsible for the costs of a disabled student's education. We also disapprove the decision of the Office of Administrative Hearings in *Parent v. Elk Grove Unified Sch. Dist.* (OAH case No. 2013020224, Feb. 19, 2013 Order Granting Motion to Dismiss Berkeley Unified School District (*Elk Grove*), to the extent it is inconsistent with this decision. Therefore, MBUSD was responsible for the costs of Parents' transportation relating to B.H.'s placement in the Sonoma facility.

## LEGAL BACKGROUND: THE IDEA

To assist in understanding the facts and legal analysis, we begin with a summary of the IDEA and California law implementing it.

I. *Free Appropriate Public Education (FAPE) and Individualized Educational Plan (IEP)*

The purpose of the IDEA is to ensure that all "children with disabilities" receive a "free appropriate public education that emphasizes special education and related services designed to meet their unique needs." (20 U.S.C. § 1400(d)(1)(A), see §§ 1401(C), 1401(a)(18), 1412(a)(1)(A); *Honig v. Doe* (1988) 484 U.S. 305, 308–310 (*Honig*); *County of San Diego v. Cal. Special Educ. Hearing Office* (9th Cir. 1996) 93 F.3d 1458, 1461.) To accomplish this goal, the IDEA "provides federal funds to assist state and local agencies in educating children with disabilities, but conditions such funding on compliance with certain goals and procedures." (*Ojai Unified School Dist. v. Jackson* (9th Cir. 1993) 4 F.3d 1467, 1469 (*Jackson*); *County of Los Angeles v. Smith* (1999) 74 Cal.App.4th 500, 508 (*Smith*).)

5

In the nomenclature of the IDEA, a FAPE refers to the special education and related services available at public expense under public supervision and direction, and without charge to eligible children's parents, which satisfy state educational standards. (20 U.S.C. §§ 1401(9) (A)–(D), 1414(d); 34 C.F.R. § 300.17; Cal. Code Regs., tit. 5, § 3001, subd. (p).) "Special education" is instruction specifically designed to meet the unique needs of a child with a disability. (20 U.S.C. § 1401(29); 34 C.F.R. § 300.39; Ed. Code, § 56031.) "Related services," including transportation and supportive services, must be provided if they are necessary to enable an eligible child with a disability to benefit from his special education program. (20 U.S.C. § 1401(26)(A); 34 C.F.R. § 300.34; Ed. Code, § 56363, subd. (a); *Irving Independent School Dist. v. Tatro* (1984) 468 U.S. 883, 891; *Union School Dist. v. Smith* (9th Cir. 1994) 15 F.3d 1519, 1527.)

A FAPE is implemented through the child's IEP. (*Honig, supra,* 484 U.S. at p. 311) An IEP is a written statement for the child developed in a participatory process involving parents and school personnel. The IEP describes the child's needs, academic and functional goals, and a statement of the special education, related services, and program modifications and accommodations that will be provided. (20 U.S.C. §§ 1401(14), 1414(d); Ed. Code, §§ 56032, 56345, subd. (a).)

The student must be provided with a continuum of alternative placements to meet the student's needs. (20 U.S.C. § 1400(d)(1)(A); 34 C.F.R. § 300.115(a).) If the intensive level of services provided by a residential treatment center or licensed children's institution is

6

necessary for a student's FAPE, the student's placement in such a facility is an appropriate part of the IEP.  (See 20 U.S.C. §§ 1401(6), (27) [defining elementary and secondary schools to include "residential schools"].)[2]  "If a seriously emotionally disturbed child cannot function in a normal school setting, the right to a free public education at no charge to a parent extends to situations where a youngster is placed in a public or private residential program."  (*Smith, supra,* 74 Cal.App.4th at p. 518, citing 34 C.F.R. §§ 300.302, 300.309(b).)

II. *California Scheme and Local Educational Agency* (*LEA*)

California has adopted a comprehensive statutory scheme to conform California special education law to the requirements of the IDEA.  (See Ed. Code, §§ 56000, subd. (a), 56026, subds. (a)–(d), 56303; *Los Angeles Unified School Dist. v. Garcia* (2013) 58 Cal.4th 175, 183 (*Garcia*); *Smith, supra,* 74 Cal.App.4th at p. 518.)  California law determines which local educational agency, referred to as an "LEA," is responsible for the provision of a FAPE and preparation of an IEP.

The determination of the responsible LEA is usually a function of the parent's residency.  Generally, elementary and secondary school students must attend school in the district in which their parent or legal guardian

---

[2]      As relevant here, an licensed children's institution is a residential facility, licensed by the state that provides 24–hour nonmedical care and supervision to, among others, children with exceptional needs.  (Ed. Code, § 56155.5, subd. (a); Cal. Code Regs., tit. 22, § 80001, subd. (g)(1).)  Recognizing that they may differ in specific respects (although the parties do not identify how), for purposes of our discussion, we use the terms residential treatment center and licensed children's institution interchangeably.

resides, and that school district is the appropriate LEA. (Ed. Code, §§ 48200, 56028; *Katz v. Los Gatos–Saratoga Joint Union High School Dist.* (2004) 117 Cal.App.4th 47, 54 (*Katz*).) However, there are exceptions.

All California school districts and county school offices have formed consortiums to provide special education services to children residing within their boundaries. The consortium for each region is called a Special Education Local Plan Area, referred to by the acronym "SELPA." (See Ed. Code, § 56195.7.) An exception to the general rule for determining the responsible LEA is found in Education Code sections 56155 and 56156.4, subdivision (a). Under those provisions, if a disabled child is "placed in a licensed children's institution . . . by a court, regional center for the developmentally disabled, or *public agency, other than an educational agency*" (Ed. Code, § 56155, italics added), then the "special education local plan area [SELPA, not the school district of the parents' residence] shall be responsible for providing appropriate education to [children] residing in licensed children's institutions . . . located in the geographical area covered by the local plan." (Ed. Code, § 56156.4, subd. (a)).

III.    *Due Process Hearing*

In the event of a dispute regarding the child's FAPE, the IDEA and California law afford students, parents and the LEA the procedural protection of an impartial administrative, or "due process," hearing. (20 U.S.C. § 1415(b)(6); 34 C.F.R. 300.511; Ed. Code, §§ 56501, 56505; Cal. Code Regs., tit. 5, § 3082.) As here relevant, a student may initiate a due process

8

hearing against a public agency[3] to determine if the agency is responsible for the provision of special education and related services. (See *Union School Dist. v. Smith* (9th Cir. 1994) 15 F.3d 1519, 1525; *J.S. v. Shoreline School District* (W.D. Wash. 2002) 220 F.Supp.2d 1175, 1191.) The party filing the complaint has the burden of persuasion by a preponderance of the evidence. (*Schaffer ex rel. Schaffer v. Weast* (2005) 546 U.S. 49, 56–62; see 20 U.S.C. § 1415(i)(2)(C)(iii).)

## FACTUAL AND PROCEDURAL BACKGROUND

In March 2015, Parents initiated a due process hearing on behalf of B.H. against MBUSD.[4] At issue was whether MBUSD was responsible for implementing its IEP and paying parents' travel expenses in placing B.H. at a residential treatment center called True to Life Counseling, Child and Family Services (TLC), and its affiliated nonpublic high school, Journey High School (Journey), located in Sonoma County. Our summary of relevant facts is based on the evidence produced at that hearing.

---

[3] In this context "public agency" includes a "school district, county office of education, [SELPA] . . . or any other public agency . . . providing special education or related services to individuals with exceptional needs." (Ed. Code, §§ 56500, 56028.5.)

[4] The due process hearing was also filed against Sonoma County Office of Education and Los Angeles Unified School District (LAUSD), both of which were subsequently dismissed.

I. *B.H.'s Initial Placements*

B.H. was originally placed by DCFS with Parents at age nine months as a foster child. A year later they adopted him. The parents live within the geographical boundaries of MBUSD.

Through eighth grade, B.H. struggled in MBUSD schools. At the time, he was not designated a special needs child. In August 2013, Parents enrolled B.H. in ninth grade at Da Vinci Communication Academy (Da Vinci), a charter school in Los Angeles County outside MBUSD's boundaries. B.H. did not receive special education services there. While attending Da Vinci, B.H. was hospitalized twice after he, among other things, suffered psychotic episodes, expressed suicidal ideation, and engaged in self–mutilation. After his second hospitalization in February 2014, B.H.'s psychiatrist recommended that he be placed in a residential treatment center. On a friend's recommendation, parents located Vista Del Mar, a residential treatment center which operates Vista School (Vista), a nonpublic school located within LAUSD's boundaries.

Parents withdrew B.H. from Da Vinci and placed him at Vista Del Mar and Vista. On parents' application, DCFS provided Parents financial assistance to help pay for the residential placement at Vista Del Mar.

II. *Adoption Assistance Program (AAP)*

The purpose of AAP is to encourage foster parents to adopt by not reducing funds they would otherwise be entitled to receive as foster parents, and by providing additional financial assistance to adoptive parents to meet the special needs of former foster children. (See 42 U.S.C. § 620, et seq.; Welf. & Inst. Code, § 16115, et seq.) AAP also permits DCFS to provide additional financial assistance to the families of adoptive children whose

10

serious emotional or mental health needs preexisted the adoption. This assistance may include costs associated with the child's placement in a residential treatment center, if that placement is necessary for the child to access a special educational curriculum and services from a nonpublic school outside the physical boundaries of the school district where the child's adoptive family resides. (See 42 U.S.C. § 620, et seq.; 22 C.F.R. § 35325(a); Welf. & Inst. Code, § 16115 et seq.)

According to testimony at the due process hearing, DCFS maintains a non–exhaustive list of residential facilities which satisfy AAP criteria. But the agency does not directly place an adopted child in out–of–home care. The child's parents must choose the residential placement. The parents may apply for AAP financial assistance to defray the expense of the residential treatment center. DCFS will grant the parents' AAP funding request upon satisfaction of certain requirements.[5] AAP funding is authorized for up to 18 months, but may be extended in some cases. Once their application for the AAP stipend is approved, parents may elect to have DCFS disburse their AAP funds directly to the residential treatment center, or may obtain reimbursement themselves for costs incurred. After the AAP prerequisites have been satisfied and an adopted child has been placed in a residential treatment center, DCFS does not track or monitor the child's progress. DCFS

---

[5] DCFS requires that the child's parents initiate contact with the center, complete any intake requirements, and actively work with DCFS to create a plan to reunify the family. Once the parents have selected a placement they must provide DCFS with certain information, including a letter from a treating therapist or physician specifying why the child requires residential treatment, and proof that the facility is an unlocked, licensed and nonprofit facility eligible to receive AAP funding, plus a breakdown of monthly costs.

may not terminate a parent's chosen placement for an adopted child, because DCFS no longer has "custody" over the child.

III.    *MBUSD's Assessment of B.H.*

B.H. did not progress while at Vista Del Mar/Vista. His depression and self–mutilation continued and he was hospitalized several times by the end of May 2014.

On June 1, 2014, mother wrote to MBUSD, explained B.H.'s diagnosis, and opined that Vista Del Mar was no longer an appropriate placement for her son. Parents formally requested that MBUSD assess B.H. "for special education and related services," noting that they had received a professional recommendation that B.H. be placed in nonpublic residential treatment.

Initially MBUSD informed Parents that it was LAUSD's responsibility to assess B.H. However, MBUSD also informed Parents that if, in the course of its assessment, LAUSD determined that B.H. was "eligible to receive services," MBUSD would be invited to an IEP meeting to work with LAUSD and Parents to "make the appropriate placement and educational decisions that [would] meet [B.H.'s] needs. If [that assessment] team agree[d] to offer special education and related services and [Parents] accept[ed], [B.H. would] once again become a student served by MBUSD." In September 2014, after Parents' attempts to have LAUSD assess B.H. were unsuccessful, MBUSD agreed to conduct B.H.'s assessment. Parents provided DCFS's documentation to MBUSD specifying the requirements they had been required to satisfy in order to receive AAP funding for Vista Del Mar, including securing an IEP, and which they would be required to meet again to receive approval for AAP funding for a new placement.

Around the same time, mother informed MBUSD that Parents believed TLC, a residential treatment center in Sonoma County, was an appropriate placement to meet their son's particular needs, and requested that MBUSD consider that placement. Journey, a nonpublic high school, approved by the California Department of Education (Ed. Code, § 56034), is affiliated with and located on the TLC campus.

On September 24, 2014, parents informed MBUSD that TLC had interviewed and accepted B.H. He was scheduled for admittance on December 1, 2014.

On November 7, 2014, MBUSD completed its assessment of B.H. The assessment report recommended that B.H. be found eligible for special education and related services under the category of emotional disturbance. Given B.H.'s "medical history of depression, suicidal ideation, and engagement of self–harm behaviors," the report "recommended that the least restrictive environment [was] 24 hours/7 day a week care in" a residential treatment center. The report noted that later, an IEP team would meet to decide on an appropriate educational program for B.H.

On about November 3, 2014, Lynn Burrell, MBUSD's school psychologist, informed mother that she believed TLC was a "good fit" and would be an "appropriate placement" for B.H. Burrell said she intended to recommend that B.H. be placed there at the November 10 IEP meeting, and instructed mother to "send the paperwork to [DCFS]."

On November 6, 2014, Parents requested that DCFS extend B.H.'s AAP funding, and authorized the agency to transfer their AAP payments to TLC, the "preapproved" residential treatment center. According to Burrell, MBUSD would not have recommended TLC had it not been for Parents' receipt of AAP funding.

13

IV.  *MBUSD's IEP Team Meeting*

On November 10, 2014, MBUSD convened an IEP team meeting, in which Parents participated.  After reviewing the assessment report, the IEP team found B.H. eligible for special education under the category of Emotional Disturbance and developed a formal IEP.[6]

The IEP noted that B.H. was unable to participate in a general curriculum educational environment and required a year–round program at a residential treatment center as the least restrictive environment to meet his needs at the time, and a "24–7 therapeutic environment in order to access curriculum."  B.H.'s educational services were to be provided in a "Non Public Residential School" in a 24/7 residential treatment center, with the consistent provision of therapeutic services year–round.  The IEP also provided for "[t]ransportation to and from residential treatment for therapeutic visits per recommendation of the treatment team."

At the due process hearing in June 2015, Lindy Alley, MBUSD's program specialist, acknowledged that if the IEP team recommends residential treatment or special educational services from a nonpublic school outside MBUSD, the IEP would also include a recommendation for transportation to and from school.  The IEP concluded with the statement that, "[t]he *professional IEP team is recommending placement in Journey [nonpublic school] which works closely with the [residential treatment center] TLC, being considered by [Parents]."*  (Italics added.)

---

[6]    As a person with a disability diagnosed as "emotionally disturbed," B.H. is qualified to receive special education and related services.  (Ed. Code, § 56155, 56156.4, subd. (a); 20 U.S.C. § 1401(3)(A).)

14

Parents gave their written consent to implementation of the IEP at the November 10, 2014 meeting. Based on the IEP, they believed that MBUSD was placing B.H. at TLC/Journey, and understood that MBUSD would finance the educational portion of their son's placement.

Parents' agreement with DCFS for AAP financial assistance was not finalized by November 10. At the IEP meeting, Parents informed MBUSD that they expected to receive approval for AAP funding for the residential portion of B.H.'s placement within "a couple days." According to mother, at the November 2014 IEP meeting, MBUSD personnel told Parents "not to worry" if AAP funding for the residential costs did not come through. Mother understood this representation to mean that MBUSD would cover the cost for the residential portion of B.H.'s placement, if necessary. No one from MBUSD at the IEP meeting told Parents that MBUSD had conducted its IEP only to prepare for the eventuality that B.H. might return to live in Parents' home. Mother also testified at the due process hearing that Alley instructed her at the November 10, 2014 meeting to save her receipts so MBUSD could reimburse the family's travel expenses to TLC.

At some point after the IEP meeting, but before B.H. enrolled at TLC/Journey, Burrell contacted mother to ascertain whether the DCFS contract for AAP funding had been finalized. During that conversation mother told Burrell that Rita Nwabuzoh, the DCFS post–adoption social worker assigned to the case, was questioning why B.H. was moving home after he was discharged from Vista Del Mar. Burrell told mother that, in her opinion, it would be therapeutic for B.H. to return home over the Thanksgiving holiday before leaving for TLC.

V. *B.H.'s Placement at TLC/Journey*

On November 24, 2014, Parents informed MBUSD they had signed the contract with DCFS, and received approval for AAP funding for TLC from December 1, 2014 to November 30, 2015.

B.H. was discharged from Vista Del Mar on November 26, 2014. He returned to Parents' home in Manhattan Beach, where he remained for a five–day extended Thanksgiving holiday. Parents drove B.H. to TLC, and he was admitted on December 1, 2014.

On December 1, 2014, mother and TLC's admissions director signed an agency–group home agreement,[7] and an agreement authorizing DCFS to transfer Parents' AAP funds directly to TLC. TLC forwarded these documents to DCFS. In response, DCFS informed TLC that DCFS had no need for the group home agreement, because B.H. was no longer a foster child under dependency court jurisdiction. DCFS informed TLC that DCFS was not responsible for B.H.'s placement at TLC, and that its sole involvement was to facilitate the "transfer of . . . (AAP) funding directly to [TLC] for his placement."

Nwabuzoh, and Angelica Petitt, the DCFS post–adoption social workers assigned to facilitate Parents' applications for AAP stipends for TLC and Vista Del Mar, respectively, testified that, if B.H. had transferred directly from Vista Del Mar to TLC/Journey, Parents' initial 18–month AAP contract would continue to run. However, if the child returned home after being discharged from Vista Del Mar before enrolling at another residential

---

[7] The "group home agreement" identifies "L.A. Aid to Adoption" as the "agency" placing B.H. in the group home (TLC). At the due process hearing, mother testified that she believed it was she who signed the agreement.

treatment center, even if just for one day, the family was eligible to begin a new 18–month funding contract.

At the due process hearing, Nwabuzoh testified that once DCFS approved Parents' request for the AAP stipend for TLC and made arrangements to transfer Parents' AAP funds directly to TLC, the agency would take no further action. She testified that in this case, as in all post–adoption AAP matters, DCFS did not recommend, choose or manage B.H.'s placement at TLC, nor did the agency track his progress while he was there. Nwabuzoh also testified that DCFS does not locate placements for families eligible for AAP assistance. The family must find the placement, which must satisfy the necessary criteria. Nwabuzoh, Petitt, and a Deputy County Counsel assigned to DCFS's adoptions division, all testified that AAP merely provides financial benefits to families who adopt former foster children (and, among other things, covers the cost of the residential placement, including room, board and psychological services). DCFS merely facilitates the transfer of the adoptive parents' AAP funds to a residential placement center. Once the post–adoptive child has been placed in a parent's chosen residential treatment center which satisfies the necessary criteria, DCFS closes its case. From that point on the payment of AAP funds is "merely an accounting function." According to the deputy county counsel, the "[b]ottom line is, [DCFS] writes a check."


IV.   *MBUSD's Refusal to Implement the IEP*

MBUSD became aware that B.H. had been admitted to TLC on December 2, 2014, when mother sent program specialist Alley an email stating that "[B.H.] started at TLC yesterday and it went well." Alley forwarded mother's email to Ellyn Schneider, then MBUSD's Executive

17

Director of Student Services. Schneider responded, informing Parents that MBUSD had "assessd [*sic*] and developd [*sic*] an IEP for B.H. to ensure that he had an appropriate placement if he left Vista Del Mar and moved back into [Parents'] home, in which case [MBUSD] would be the responsible school district." However, MBUSD took the position that B.H. had not returned home, but "was transferred from Vista Del Mar directly to another [licensed children's institution] (TLC) . . . in [N]orthern California." Accordingly, MBUSD denied that it was "responsible for funding B.H.['s] placement at Vista Del Mar and/or his placement at his new [licensed children's institution] and school,"[8] and refused to reimburse Parents for expenses incurred transporting B.H. to TLC.

On January 29 and 30, 2015, mother wrote again to Alley expressing confusion as to why MBUSD was now denying its responsibility for B.H., who had been "discharged from Vista Del Mar on 11/26/14" and "moved home" that same day before enrolling several days later at TLC/Journey. Mother disputed MBUSD's representation that the only reason it had conducted the Assessment and prepared the IEP was "to ensure [B.H.] had an appropriate placement" in the event he returned to school within MBUSD's jurisdiction. She pointed out that the November 10, 2014 IEP, which was "written with residential treatment in mind," specifically stated that B.H. "[would] be attending Journey High School" in Sonoma County. Mother also reiterated her understanding that (1) MBUSD's FAPE offer was for placement at a nonpublic school and residential treatment center with the understanding

---

[8] Apparently, Parents requested reimbursement from MBUSD for the time B.H. attended Vista. The record does not contain such a request, and this is not an issue on appeal.

that the residential component of that placement would be funded through Parents' stipend from the AAP; (2) MBUSD would monitor B.H.'s progress to ensure that his IEP goals were met, including visits to TLC to confirm that it continued to be a "good fit for his needs" and, if it was not, would move B.H. to a more appropriate facility of MBUSD's choosing; and (3) MBUSD would reimburse Parents for travel expenses to TLC.

On February 12, 2015, Susan Curtis, MBUSD's Director of Special Education, responded to mother's letters stating: "[B.H.'s mother] contacted [MBUSD] at some point in the Fall of 2014, indicating that [LAUSD] . . . had not responded to her request for an assessment. [Mother] also informed [MBUSD] that she might remove [B.H.] from Vista Del Mar before placing him in another school or facility, in which case he would have returned to her home, which is located within the boundaries of MBUSD. For these reasons, MBUSD assessed and convened an IEP team meeting for [B.H.]. The IEP was developed to be implemented in the event that [B.H.] was removed from Vista Del Mar . . . and returned to [Parents'] home within the boundaries of MBUSD. However, that never occurred. Rather, . . . [B.H.] was transferred by [DCFS] from Vista Del Mar directly to another [licensed children's institution] (TLC). MBUSD was not involved in the decision, planning, or funding of [B.H.'s] transfer to TLC. For these reasons, [B.H.] never became MBUSD's responsibility and therefore, [MBUSD was] not required to implement the IEP developed in November [2014]." In mid–March 2015, MBUSD wrote to Parents reiterating its position that it was not responsible for implementing the November 2014 IEP because DCFS, a non–educational public agency—not MBUSD—had placed B.H. at TLC, and because B.H. was not a resident of MBUSD on or after December 1, 2014.

19

At the due process hearing, Director Curtis acknowledged that when she wrote her February 2015 letter, she did not know that B.H. actually had "returned" home to "Manhattan Beach from November 26 through December 1st of 2014."[9] Curtis also conceded that there was no factual basis for her statement that B.H. transferred directly from Vista Del Mar to TLC.

## V. *Sonoma Denies Being the Responsible LEA*

B.H. remained at TLC and attended Journey from December 1, 2014 to December 19, 2015. The Sonoma County Office of Education (Sonoma) administers the local SELPA. Mandy Hoffman is Sonoma's Principal/Administrator. She initially assumed that B.H. had been placed at TLC/Journey by a noneducational agency. Accordingly, when Hoffman received B.H.'s records from TLC/Journey, she acknowledged that Sonoma was the responsible LEA, and instructed TLC/Journey to bill Sonoma "from the date of enrollment while [B.H.] has been residing at [TLC/Journey] and placed by AAP."

However, after reading B.H.'s November 10, 2014 IEP, Hoffman realized she was mistaken, and that B.H. was actually placed by MBUSD. Thus, Hoffman concluded that Sonoma was not responsible "to manage B.H." because MBUSD's IEP "clearly offered a nonpublic school and residential" placement. Because it was "a school district placement at the nonpublic school and licensed children's institution, not another governmental agency

---

[9] Parents themselves received the AAP stipend from DCFS for the five–day period between B.H.'s discharge from Vista Del Mar and his enrollment at TLC/Journey.

placement," Hoffman interpreted the IEP to be MBUSD's offer of a FAPE to B.H. to include a residential treatment center.

In early February 2015, Sonoma informed MBUSD that Parents had requested reimbursement for travel expenses to TLC/Journey. Sonoma denied responsibility for such expenses, except in cases in which a student requiring a nonpublic school placement had been placed by a noneducational governmental agency. Sonoma invited MBUSD to attend an IEP meeting, then scheduled for February 26, 2015, and asked MBUSD to provide documentation reflecting that its IEP offer had been changed to permit Sonoma to determine if it was the LEA responsible for B.H.'s education.

In response, MBUSD informed Sonoma that MBUSD had conducted the November 2014 IEP only in order to be prepared, in the event B.H. moved home. MBUSD claimed that B.H. had not done so. Instead, he moved directly from Vista Del Mar into the DCFS—arranged placement at TLC/Journey. Accordingly, MBUSD informed Sonoma that MBUSD "was not involved in the decision, planning, or funding of [B.H.'s] transfer to" TLC/Journey. In addition, because B.H. never returned home, he "never became MBUSD's responsibility," so MBUSD was "not required to implement" its November 2014 IEP. MBUSD declined to attend Sonoma's February IEP meeting. Sonoma subsequently cancelled that meeting and also denied that it was the responsible LEA.

By now, it is undisputed that all expenses incurred on behalf of B.H. from December 2, 2014 until he left TLC/Journey in December 2015 have

been paid or reimbursed.[10]  By this action, B.H. seeks only reimbursement of travel expenses incurred of $2,288.

VI.    *OAH Due Process Hearing—ALJ Ruling*

At the due process hearing, Parents contended that B.H. had been placed at TLC/Journey pursuant to the IEP developed by MBUSD, and that MBUSD was therefore responsible for meeting his special education needs. The administrative law judge (ALJ) disagreed.  He concluded that "[t]he evidence demonstrates that placement at TLC was not made pursuant to the IEP.  Mother had identified [TLC] and set in motion the application process both with [TLC] and DCFS prior to the assessment by [MBUSD]. . . .  [A]t the time that [MBUSD] agreed to conduct the [assessment, mother had informed [MBUSD] that she was already looking at placement at [TLC] and Journey," and "informed [MBUSD] that she had decided on [TLC].  [TLC's] intake form shows that the file was opened on September 29, 2014, prior to [MBUSD] commencing the [A]ssessment on September 30, 2014."

---

[10]    Sonoma prepared an IEP for B.H. on November 20, 2015, following the due process hearing in this matter.  B.H. moved back to Parents' home in Manhattan Beach on December 19, 2015.  The parties agree that since January 7, 2016, MBUSD has funded B.H.'s attendance at a nonpublic school pursuant to Sonoma's November 2015 IEP, has implemented subsequent IEPs for B.H., and has funded educational and related services.

MBUSD argues that the administrative law judge (ALJ) found that Sonoma eventually implemented MBUSD's November 10, 2014 IEP, and provided B.H. all services called for therein.  B.H. denies that he received the full scope of educational and related services to which he was entitled under the November 2014 IEP.  The record contains no evidence on this point.  In any event, this issue is not before us, and to the extent it remains viable, may be addressed on remand.

The ALJ acknowledged that "DCFS is concerned with the reunification of the child with his adoptive family and not with his education progress." Nevertheless, the ALJ stated: "[DCFS] must determine whether the proposed placement meets certain conditions. The agency is required to have approved the plan for reunification of the child to his family. Because the authorization is limited to no more than 18 months, [DCFS] is in effect monitoring progress as parents are required to reapply for a renewal of funding. Here, Parents had to reapply for an extension of the funding as well as the transfer from Vista Del Mar to TLC. As part of this application, Parents had to provide DCFS a reunification plan. . . . *Since . . . DCFS . . . has final say in the placement[,] this is tantamount to making the placement*." (Italics added.)

Relying in part on the administrative decision in *Elk Grove, supra*, at page 5, the ALJ found that Education Code sections 56155 and 56156.4, subdivision (a) applied, excepting MBUSD from the general rule that the school district of the parents' residence is responsible to pay the costs of a disabled student's education. The ALJ concluded that DCFS was a "public agency, other than an educational agency" under Education Code section 56155, that DCFS had placed B.H. in the Sonoma facility, and that therefore, under Education Code section 56156.4, subdivision (a), MBUSD was not responsible for the costs of MBUSD's education.

VII. *B.H. Appeals to the Trial Court*

B.H. appealed the ALJ's decision to the trial court which affirmed. The trial court reasoned that, had Parents failed to satisfy the requirements for receipt of AAP financial assistance, B.H. "would not have been approved to be at" TLC/Journey. The court also found that B.H.'s return to Parents' home

23

with "an intention that he remain" was a prerequisite to MBUSD's IEP being effective.

## DISCUSSION

Judicial review in IDEA cases "differs substantially from judicial review of other agency actions, in which courts are generally confined to the administrative record and are held to a highly deferential standard of review." (*Jackson, supra,* 4 F.3d at p. 1471; *JG v. Douglass County School Dist.* (9th Cir. 2008) 552 F.3d 786, 793 ["In IDEA cases, unlike other cases reviewing administrative action, [courts] do not employ a highly deferential standard of review"] (*JG*).) Questions of law are reviewed de novo, as are mixed questions of law and fact. (*N.B. v. Hellgate Elementary School Dist.* (9th Cir. 2008) 541 F.3d 1202, 1207; *Hood v. Encinitas Union School Dist.* (9th Cir. 2007) 486 F.3d 1099, 1104, fn. 4 (*Hood*).)

"Nevertheless, complete de novo review 'is inappropriate'" and courts give "'due weight' to state administrative proceedings." (*JG, supra,* 552 F.3d at p. 793.) We may accord deference to an ALJ's factual findings if those findings are thorough and careful, but "'the extent of deference to be given is within our discretion.'" (*M.C. ex rel. M.N. v. Antelope Valley Union High* (9th Cir. 2017) 858 F.3d 1189, 1194 (*M.C.*).) An ALJ's findings are not "'thorough and careful'" if they fail to address and resolve pivotal issues and/or disregard material evidence presented at the administrative hearing. (*Ibid.*) Moreover, the appellate court must ensure that the standards as articulated and applied by an ALJ at a due process hearing do not fall below the minimum standard set by the IDEA. (See *E.M. ex rel. E.M. v. Pajaro Valley Unified School* (9th Cir. 2011) 652 F.3d 999, 1005; Ed. Code, § 56000, subd. (c); *County of San Diego v. Cal. Special Educ.* (9th Cir. 1996) 93 F.3d 1458, 1466

24

["[a]t bottom, the court . . . is free to determine independently how much weight to give the administrative findings"].)  The party challenging an administrative decision bears the burden of proof.  (*Hood, supra,* 486 F.3d at pp. 1103–1104.)

For several reasons, we conclude that MBUSD was not absolved of its responsibility to provide B.H. with special education and related services pursuant to its November 2014 IEP.

First, MBUSD's duty with respect to B.H.'s educational placement is determined entirely by the IDEA, which requires that MBUSD provide B.H. a FAPE that emphasizes special education and related services designed to meet his unique needs.  (20 U.S.C. § 1400(d)(1)(A); 34 C.F.R. § 300.115(a).)  Where, as here, a FAPE requires the intensive level of services provided by a residential treatment center, placement in such a facility is an appropriate— and sometimes necessary—part of the student's IEP.  (See 20 U.S.C. §§ 1401(6), (27); *Clovis, supra*, 903 F.2d at p. 643.)  The statutory scheme of the IDEA (and California's complementary scheme) does not provide an exception for a school district's obligation to provide residential placement services simply because those services may be facilitated by or available through another agency under a different statutory scheme.  As the Ninth Circuit recently made clear, public school districts are free to work with noneducational public agencies, such as DCFS, to satisfy students' educational needs through the IEP process.  However, doing so will not relieve the school district of its independent obligation to comply with the IDEA.  (*M.S., supra,* 913 F.3d at pp. 1135–1138.)

The decision in *M.S.*, *supra,* 913 F.3d 1119, is instructive.  M.S. was a teenage dependent of the juvenile court, who lived within the jurisdiction of LAUSD.  M.S. qualified for special education services under the IDEA based

on her disability of severe emotional disturbance. (*Id.* at pp. 1125, 1127.) There was no dispute that M.S. required the supportive environment of a residential treatment center to access her education. However, LAUSD argued that it was excused from its obligation to consider residential placement as part of its obligation to provide the student a FAPE under the IDEA, because DCFS already had placed M.S. in a residential treatment center to address mental health and behavioral issues which required intensive psychiatric care. (*Id.* at pp. 1126, 1130.) The ALJ agreed, concluding that LAUSD "'had no obligation to offer [residential placement] as part of its FAPE offer to [M.S.], because [DCFS] had already [made such a placement] in compliance with the [juvenile] court order that it provide a residential placement to [M.S.], and . . . in compliance with its own legal obligation to provide a placement that was appropriate for [M.S.'s] mental health needs.'" (*Ibid.*)

The District Court rejected the ALJ's reasoning, and the Ninth Circuit affirmed. (*M.S., supra*, 913 F.3d at pp. 1133–1145.) As here relevant, the Ninth Circuit reasoned that DCFS's residential placement of a school–age child under its jurisdiction for reasons related to the teen's mental health pursuant to a juvenile court order did *not* relieve the school district of its independent duty to ascertain under the IDEA whether the child required a residential placement for educational reasons as part of her IEP. As the Ninth Circuit stated, the ALJ's reasoning "assumes that the two obligations at issue here—i.e., DCFS's obligation to provide necessary and appropriate 'permanent placement services' in light of M.S.'s mental health needs, and [LAUSD's] obligation to consider whether M.S. is entitled to a particular residential placement to meet her educational needs—are duplicative. This, of course, is not the case, as DCFS and [LAUSD] employ distinct criteria in

26

determining which particular residential arrangement may be most appropriate for children within their purview. And while it is true, as [LAUSD] argues, that an IEP 'is a snapshot, [and] not a retrospective,' [citation], an appropriate 'snapshot' must, at any given moment in time, sufficiently capture the child's *educational* needs. To the extent a residential placement is necessary for *educational reasons* in order to provide a FAPE' at the time the [IEPs] were drafted,' [citation], indicating as much in the IEP is not 'absurd,' as the [LAUSD] argues . . . but required." (*Id.* at pp. 1140–1141.)

As applied to the instant case, the holding of *M.S.* means that even assuming the ALJ and trial court were correct (as we explain, they were not) that DCFS's approval of the transfer of Parents' AAP stipend to TLC was "tantamount" to placement of B.H. by that noneducational agency, they were incorrect in ruling that such a placement categorically relieved MBUSD of its independent duty to implement its IEP, including B.H.'s residential placement at TLC/Journey. (*M.S., supra*, 913 F.3d at pp. 1138–1141.)

Second, the ALJ and trial court were incorrect in ruling that the AAP stipend administered by DCFS constituted "placement" by a noneducational public agency, thus excusing MBUSD under Education Code sections 56155 and 56156.4, subdivision (a) from the usual rule that a school district is responsible to educate children whose parents reside within the district's geographical boundaries (Ed. Code, § 48200). As here relevant, for purposes of Education Code sections 56155 and 56156.4, subdivision (a), a "public agency" is defined as a "school district, county office of education, special education local plan area, a nonprofit public charter school that is not otherwise included as a local education agency, . . . or *any other public agency* under the auspices of the state or any political subdivisions of the state

27

*providing special education or related services* to individuals." (Ed. Code, § 56028.5, italics added.)  In the instant case, DCFS provided financial assistance to Parents under an entirely different statutory scheme (the Welfare and Institutions Code provisions implementing the federal Adoption Assistance and Child Welfare Act) based on their adoption of B.H., a former foster child with special needs.  DCFS did not provide "special education or related services" to B.H.  (Ed. Code, § 56028.5.)  Thus, DCFS was not a "*public agency*, other than an educational agency" under Education Code section 56155 (italics added), and for that reason alone its conduct in providing financial assistance to Parents did not qualify as a "place[ment]" within the meaning of that section.  Therefore, the exception to the general rule provided by Education Code section 56156.4, subdivision (a) does not apply.[11]

Third, even were there some ambiguity in the statutory language, our reading is consistent with the purpose of the legislation.  The primary aim of the Education Code is "to benefit students[, and] 'in interpreting legislation dealing with our educational systems, it must be remembered that the fundamental purpose of such legislation is the welfare of the children.'" (*Katz, supra,* 117 Cal.App.4th at p. 63.)  The code must be interpreted reasonably and the court must maintain its focus on what benefits the

---

[11]  It is noteworthy that Education Code section 56155 also does not identify parental placement as an exception to the rule that a parent's district of residence is responsible for educating the child.  (See *Student v. Alhambra Unified Sch. Dist.* (Oct. 7, 2013, OAH case No. 2013020224, at p. 9; see also *Santa Ana Hospital Medical Center v. Belshe* (1997) 56 Cal.App.4th 819, 831 [OAH decisions are not precedent, but "'may be cited for their persuasive value, and are occasionally followed in the absence of controlling higher authority'"].)

student, not the school district. (*Ibid.*; see *Garcia, supra*, 58 Cal.4th at p. 186 [statutory language is considered "'in the context of the statutory framework as a whole in order to determine its scope and purpose and to harmonize [its] various parts'"].)

DCFS facilitates funding to parents who choose to adopt foster children through the AAP. The financial assistance provided through AAP helps to "remove[] or reduce[] barriers to the adoption of children who would otherwise remain in long–term foster care." (22 C.F.R. § 35325(a); see 42 U.S.C. § 620 et seq.; Welf. & Inst. Code, § 16115 et seq.) AAP also provides additional financial assistance to aid families who choose to adopt foster children with special needs. (42 U.S.C. §§ 670–676; *ASW v. Oregon* (9th Cir. 2005) 424 F.3d 970, 972.)

Here, Parents received financial assistance from AAP for TLC and Vista Del Mar under Welfare and Institutions Code section 16121, subdivision (b), which states: "Payment may be made on behalf of an otherwise eligible child in a . . . residential care treatment facility if [DCFS] . . . has confirmed that the placement is necessary for the temporary resolution of mental or emotional problems related to a condition that existed prior to the adoptive placement. . . . The designation of the placement facility shall be made after consultation with the family by [DCFS] the department . . . responsible for determining . . . (AAP) eligibility and authorizing financial aid. . . . [R]esidential placement shall only be made as part of a plan for return of the child to the adoptive family, that shall actively participate in the plan. [AAP] benefits may be authorized for payment for an eligible child's . . . [residential treatment center] placement if the placement is justified by a specific episode or condition and does not exceed an 18–month cumulative period of time. After an initial authorized . . . [residential treatment center]

29

placement, subsequent authorizations for payment for a . . . [residential treatment center] placement may be based on an eligible child's subsequent specific episodes or conditions."

Under Welfare and Institutions Code section 16121, DCFS has authority to designate and administer AAP funding for temporary placement in a residential treatment center of an adopted former foster child. The purpose is to ease financial burdens and enable the adoptive family to address a child's serious mental health or emotional problems that pre–existed adoption. The fundamental goal is to facilitate reunification of the child and his adoptive family. Nowhere does the statute authorize DCFS to facilitate a residential placement for the purpose of providing special needs education. Such authority arises only when a student is a dependent of the juvenile court, and the court orders or permits DCFS to make educational decisions on behalf of the child. (*In re R.W.* (2009) 172 Cal.App.4th 1268, 1276.)

Fourth, MBUSD's argument that DCFS is responsible for placement is based on a misinterpretation of Welfare and Institutions Code sections 16119 and 16120.05. Welfare and Institutions Code section 16119 is a general provision entitled "Information; financial aid to adoptive family." Its terms are not specific to financial aid for residential treatment center placements (which are covered in detail in Welf. & Inst. Code, § 16121, subd. (b).) Further, contrary to MBUSD's interpretation, section 16119, subdivision (c) creates no ongoing obligation to monitor or assess a child. Rather, it permits the agency to evaluate and modify the amount of stipend if warranted due to a change of circumstances.

Similarly, Welfare and Institutions Code section 16120.5 requires that the benefit amount be reassessed bi–annually, and that the family report

30

changes in circumstances to DCFS. This section also allows DCFS to review a family's circumstances to ensure that the amount of financial assistance provided remains appropriate. Sections 16119 and 16120.5 do not apply if it is necessary to remove the child from the home to address his or her temporary mental health needs. Financial aid for that purpose is covered by Welfare and Institutions Code section 16121, subdivision (b), and should not exceed 18 months. Finally, the requirement to reapply after 18 months does not constitute monitoring of the placement by DCFS, which is not called upon to do anything but provide financial assistance, unless the family seeks to extend the aid beyond 18 months.

Fifth, MBUSD relies, as did the ALJ below, on *Elk Grove*, *supra*. That decision does not change the result here.

In *Elk Grove*, a student whose parent resided within Berkeley Unified School District (Berkeley) was placed in a licensed children's institution located within the SELPA for the Elk Grove Unified School District (Elk Grove). The student's parent had an AAP financial aid agreement in place with the Alameda County Social Services Agency (ACSSA). Berkeley moved to be dismissed from the action, arguing that ACSSA was a noneducational public agency, that it placed the student at the licensed children's institution outside Berkeley's boundaries, and that therefore, under Education Code section 56156.4, subdivision (a), Berkeley was not responsible for the costs of the student's education. (*Id*. at pp. 1–2.) The student agreed with Berkeley's contention that the student had been placed by ACSSA. The student simply argued that if the placement was not considered made by ACSSA, Berkeley should not be dismissed, because it was the district of the parent's residence and would be responsible for the education costs. (*Id*. at p. 3.)

The ALJ granted Berkeley's motion to dismiss. The ALJ observed that that "[w]here individuals with exceptional needs are placed in a licensed children's institution . . . by a public agency, other than an educational agency, the 'special education local plan area shall be responsible for providing appropriate education to individuals with exceptional needs residing in licensed children's institutions . . . located in the geographical area covered by the local plan.' (Ed. Code, §§ 56155, 56156.4(a).)" (*Id.* at p. 2.) Without analysis, the ALJ concluded that ACSSA was "a public agency who [*sic*] is not an educational agency," that ACSSA had placed the student in the licensed children's institution, and that therefore the SELPA in which the placement was located was responsible for the student's costs of education, not Berkeley. (*Id.* at p. 3.)

We find *Elk Grove* unpersuasive. Because the student conceded that ACSSA placed the student, the ALJ did not analyze whether financial aid administered by a county social services agency through AAP constitutes a "placement" by that agency. (*Elk Grove,* at p. 2.) For the reasons we have discussed (none of which was considered in *Elk Grove*) we conclude that it does not. To the extent *Elk Grove* suggests to the contrary, we disapprove it.

Sixth, the ALJ determined (and the trial court agreed) that MBUSD was not obligated to implement its November 2014 IEP because B.H.'s placement at TLC/Journey had not been made pursuant to that IEP. Rather, Parents "identified [TLC/Journey] and set in motion the application process both with [TLC/Journey] and DCFS prior to the assessment by" MBUSD. Thus, the ALJ concluded that "Parents made the placement pursuant to [DCFS'] requirements." This reasoning is flawed.

School districts must educate students if the student's parent resides within the district. (Ed. Code, § 48200; *Garcia, supra,* 58 Cal.4th at pp. 186–

32

187; *Katz, supra*, 117 Cal.App.4th at p. 57.)  As discussed above, the exception to this rule found in Education Code section 56156.4, subdivision (a) is not applicable because the provision of a stipend through AAP by DCFS, a non–educational public agency, is not an educational placement, and did not relieve MBUSD of its independent obligation to comply with the IDEA.  (See Ed. Code, § 56155; cf., *M.S., supra*, 913 F.3d at pp. 1136–1141.)  Contrary to its later assertions, the record reflects that MBUSD was aware of and acknowledged its educational responsibility for B.H. as early as June 2014, when Alley informed mother that her son would "become a student served by MBUSD" if an assessment team agreed to offer him special education and related services.

Once the IEP was complete, MBUSD was required immediately to implement "those components of the [IEP] to which the parent has consented . . . so as not to delay providing instruction and services to the child."  (Ed. Code, § 56346, subd. (e); 20 U.S.C. § 1412(a)(4); 34 C.F.R. §§ 300.323(c)(2), 300.342(b)(1)(iii).)  "[A]s soon as possible following development of the [IEP], special education and related services shall be made available to the individual with exceptional needs in accordance with the individual's [IEP]."  (Ed. Code, § 56344, subd. (b).)  The responsibility to avoid delay in implementing an IEP expressly extends to situations in which the source for the provision or payment of special education for an eligible child has yet to be determined.  (34 C.F.R. § 300.103(c).)  Prompt implementation is imperative.  The consequences may be dire, particularly for students in the midst of mental health crises.  Delay may also impose burdens on parents with limited financial resources.

"Parental participation in the IEP and educational placement process is central to the IDEA's goal of protecting disabled students' rights and

providing each disabled student a FAPE." (*Doug C. v. Hawaii Dept. of Educ.* (9th Cir. 2013) 720 F.3d 1038, 1040; see *Endrew F. v. Douglas Co. School Dist. RE–1* (2017) ___ U.S. at p. ___, 137 S. Ct. 988, 994 [IDEA's "procedures emphasize collaboration among parents and educators"].) "'Parents not only represent the best interests of their child in the IEP development process, they also provide information about the child critical to developing a comprehensive IEP which only they are in a position to know.'" (*Anchorage School Dist. v. M.P.* (9th Cir. 2012) 689 F.3d 1047, 1055.) "[I]t would be antithetical to IDEA's purposes to penalize parents—and consequently children with disabilities—for exercising the very rights afforded to them under the IDEA." (*Id.* at p. 1056.)[12]  Moreover, "Parents have a constitutionally protected liberty interest in directing their children's education." (*In re R.W, supra*, 172 Cal.App.4th at p. 1276.)

Finally, the trial court erred in concluding that MBUSD's IEP "was never effective," because B.H. did not "return" home after his discharge from Vista Del Mar, but only "visited between placements."  The IEP did not make implementation contingent on B.H.'s return to Parents' home with an intention to remain.  Moreover, the trial court's conclusion is at odds with the rule that the determination of which LEA is responsible for a child's

---

[12]  MBUSD was required to consider Parents' input as part of the IEP process, but remained free to select a placement other than TLC/Journey. The IDEA "does not require that parental . . . requests be assigned 'primary' weight." (*K.M. ex rel. Bright v. Tustin Unified School Dist.* (9th Cir. 2013) 725 F.3d 1088, 1101; *Bradley ex rel. Bradley v. Arkansas Dept. of Educ.* (8th Cir. 2006) 443 F.3d 965, 975 [the IDEA does not require that parental preferences be implemented, so long as the IEP is reasonably calculated to provide some educational benefit].)

education is a function of the parent's residence, and does not depend on where a child may be living.

For the reasons stated above, we conclude that the financial assistance provided by the AAP program administered by DCFS did not constitute placement by that noneducational government agency. MBUSD, which crafted the November 10, 2014 IEP for B.H., was responsible for implementing that IEP, including payment of Parents' travel expenses relating to B.H.'s placement at TLC/Journey.

## DISPOSITION

The trial court judgment and ALJ's Findings and Decision are reversed. The matter is remanded to the OAH for a determination of appropriate relief in addition to Parents' recovery of travel–related expenses. B.H. is awarded costs on appeal.

**CERTIFIED FOR PUBLICATION**

WILLHITE, J.

We concur:

MANELLA, P. J.

DUNNING, J.*

*Retired Judge of the Orange County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.