Filed 5/19/22  In re J.B. CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FIVE

| | |
|---|---|
| In re J.B. et al., Persons Coming Under the Juvenile Court Law. | B313460 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>E.B.,<br><br>Defendant and Appellant. | (Los Angeles County Super. Ct. No. 18LJJP00850A-F) |

APPEAL from an order of the Superior Court of Los Angeles County, Robin R. Kesler, Judge Pro Tempore.  Affirmed.

Shaylah Padgett-Weibel, under appointment by the Court of Appeal, for Defendant and Appellant.

Tarkian & Associates and Arezoo Pichvai for Plaintiff and Respondent.

In January 2021, the juvenile court asserted dependency jurisdiction over E.B.'s (Mother's) six children, removed them from her custody, and ordered monitored visits between Mother and the children. The Los Angeles County Department of Children and Family Services (the Department) later petitioned the juvenile court to modify its disposition order to reduce the frequency of Mother's in-person visitation with the children and to restrict her rights to make decisions about their education. We consider whether the juvenile court erred in granting the Department's request.

## I. BACKGROUND

### A. *The Dependency Proceedings Through Jurisdiction and Disposition*

We described the pertinent background facts, from initiation of dependency proceedings through the juvenile court's disposition order, in resolving a prior appeal involving the children. (*In re J.B.* (Nov. 29, 2021, B310364) [nonpub. opn.].) We reproduce much of that background here and then describe what has happened since.

### 1. *Overview of the dependency allegations*

Mother has six children: Jay. B. (Jay), born in 2008; Joh. B. (Joh), born in 2009; Jor. B. (Jor), born in 2011; Jah. B. (Jah), born in 2014; Jou. H. (Jou), born in 2017; and Jan. H. (Jan), born in 2019. Jay, Joh, and Jor's father is D.P.; Jah's father is A.B.; and Jou and Jan's father is S.H. Mother was in a relationship with S.H. when dependency proceedings commenced and for at least a time afterward. This case involves multiple dependency petitions—including subsequent and supplemental petitions—

filed between 2018 and 2020, which all culminated in adjudication and disposition hearings in January 2021.

At the January 2021 adjudication hearing, the operative petitions included a first amended Welfare and Institutions Code[1] section 300 petition concerning Jan, filed September 3, 2020; a section 387 (supplemental) petition concerning all the other children filed November 5, 2019; and a first amended section 342 (subsequent) petition concerning all the other children filed September 3, 2020. The allegations pertinent to Mother include domestic violence between Mother and S.H., substance abuse, medical neglect, secreting two of the children from the Department and the juvenile court, and failure to comply with the juvenile court's orders. Rather than recite a full chronology of the dependency investigation, we shall discuss the facts relevant to each allegation and summarize the adjudication and disposition hearings.

### a.     domestic violence

The first amended section 300 petition as to Jan and the first amended section 342 petition as to the other children alleged Mother and S.H. have a history of engaging in violent altercations in the children's presence. In particular, the petitions alleged Mother attempted to hit S.H. with her car in March 2018 and S.H. pushed, strangled, and threatened to kill Mother in January 2020.

As to the March 2018 incident, Mother said she and S.H. were "arguing about gas and she 'zoomed' up on him but there

---

[1]     Undesignated statutory references that follow are to the Welfare and Institutions Code.

3

was no [domestic violence]."[2]  Mother was convicted of assault with a deadly weapon.  She explained she "took a plea deal because [sh]e didn't want to stay in jail."  As for the January 2020 incident, Mother told the social worker S.H. did not touch her but she "told the police lies about him being physical because [she] wanted him to leave."

### b.     substance abuse

In February 2019, the Department filed a section 300 petition as to the five oldest children alleging, among other things, Mother's use of marijuana rendered her incapable of providing regular care for the children.  The juvenile court sustained this allegation at an adjudication hearing in May 2019.

A later-filed section 300 petition as to Jan alleged Mother used marijuana during her pregnancy with Jan, he was of an age requiring constant care and supervision, and Mother's marijuana use rendered her incapable of providing regular care and supervision.

Mother told a Department social worker she started using marijuana at her doctor's suggestion in 2017 because the drugs her doctor originally prescribed to manage spina bifida and related pain made her "comatose."  Mother claimed she only smoked in the garage in the morning and at night when the

---

[2]     According to a Los Angeles County Sheriff's Department incident report admitted in evidence at the adjudication hearing, a witness saw Mother driving alongside S.H. and "suddenly . . . dr[i]ve over the curb and onto the sidewalk where [S.H.] was walking," forcing S.H. "to jump out of the way and climb onto a cinder block wall to avoid being struck by the vehicle."

4

children were asleep. Mother continued to use marijuana during her pregnancy with Jan to manage her pain and to help her eat. Mother told the social worker she "talked to" her doctor about using marijuana during her pregnancy, but it is not clear from the appellate record whether Mother claimed her doctor approved of her doing so. Mother said she stopped using marijuana in August 2020, but she did not submit to testing to confirm this. A social worker noticed a "strong odor of marijuana . . . from the inside of the home" when Mother answered the door on one occasion.

### c.    *medical neglect*

A first amended section 300 petition as to Jan and a first amended section 342 petition as to the other children alleged Mother failed to enroll Jay in physical therapy and to ensure he attended scheduled appointments following hip surgery.

Jay broke his hip in December 2017. Dependency proceedings began when the Department received a referral in October 2018 indicating Jay had not received follow-up care and was still using a wheelchair. The petitions alleged Jay missed appointments on July 3, 2019, July 24, 2019, and August 7, 2019.

In July and August 2019, Mother told a social worker she missed Jay's July 3, 2019, appointment because she had recently given birth to Jan (on June 15, 2019). She also said she rescheduled the July 24, 2019, appointment because it was too early in the morning. A few months later, Mother told a social worker she was unable to make the July 24, 2019, appointment because she had post-partum mobility issues. She explained Jay's doctor rescheduled the August 2019 appointment and Jay saw the doctor in September 2019. Mother said physical therapy

was not ordered until September 2019 and issues with Jay's insurance and a delay in obtaining a local referral prevented her from making a physical therapy appointment before Jay was detained from her in November 2019.

Jay's doctor's office told the social worker Mother was a "no-show" for the appointments in July and August 2019 and records indicated Mother told the office Jay did not want to wake up. Jay's father, D.P., told a social worker he did not know about Jay's missed appointments.

When a social worker sent Mother a text message in October 2019 inquiring whether any of the children had upcoming dentist appointments (only one had seen a dentist in the prior year), Mother told her to "[s]top texting period[.] these are my kids[.] worry about [yo]ur son." According to Mother, her "kids do not have to go to the dentist by law" and "as long as they are not complaining to me and [in] pain or sickness and hunger th[e]n I think I'm doing a damn good job . . . ."

### d. secreting children from the Department and the juvenile court

The first amended section 300 petition as to Jan and the first amended section 342 petition as to the other children alleged Mother tried to hide Jah and Jou from the juvenile court and the Department.

When a Department social worker advised Mother the Department was seeking a removal order for the children in October 2019, Mother said the Department would "never get her kids" and she was under no obligation to cooperate with the Department or the juvenile court. A few days later, the Department detained Joh, Jay, and Jor at school. When social

6

workers went to Mother's home to detain the younger children, S.H. said they were with relatives and the Department was "not getting them." Later that day, Mother arrived at the Department's offices with friends and threatened social workers. Mother and S.H. had the younger children brought to the juvenile court a few days later under threat of arrest.

> ### e.    *failure to comply with court orders*

In May 2019, the juvenile court ordered a case plan that required Mother to submit to weekly drug testing; undergo a mental health assessment and participate in individual counseling and classes to address substance abuse, domestic violence, and anger management issues; and obtain certain services for the children, including individualized education program (IEP) assessments for Jay and Joh and counseling for Jay, Joh, and Jor. The section 387 petition as to Jay, Joh, Jor, Jah, and Jou alleged Mother denied social workers access to her home and failed to comply with various elements of this case plan.

In the two years preceding the jurisdiction and disposition hearings in January 2021, Mother insisted she would not comply with court orders. For instance, in January 2019, Mother told a social worker she did not "give a fuck what [the juvenile court] wants." In October 2019, she told a social worker she refused to comply with juvenile court's orders because she was not going to allow the government to bully her.[3]

---

[3]    Mother's temperament was also manifest at a hearing in December 2019 at which she said "[f]uck this place" and the juvenile court indicated she "left the courtroom, hit the door

With respect to unannounced home visits by the Department, Mother told a social worker in January 2019 that she was "through" complying with the Department and the juvenile court. When the social worker told Mother an arrest warrant would likely be issued if she absconded with the children, Mother said she did not care. Mother further stated that if the social worker showed up at Mother's house again Mother would beat the social worker up.

With respect to drug testing, Mother tested positive for marijuana on two occasions in early 2019 but she did not test again between May 2019 (when the juvenile court ordered weekly testing) and January 2021 (when she testified during the adjudication hearing that she was willing to submit to testing). When a social worker sent Mother a text message in July 2019 reminding her of her obligation to drug test, Mother replied, "I'm not doing it." In November 2019, Mother again stated she would not submit to drug testing. In December 2020, Mother told a social worker she was unable to drug test because she had no transportation and was caring for her sick parents.

As of November 2019, Mother refused to participate in court-ordered individual counseling because therapy did not help her in the past and she feared it would bring up issues from her childhood and put her into a deeper depression. Mother told a social worker she did not complete 52 weeks of a domestic violence class—originally ordered as a condition of her probation for assault with a deadly weapon against S.H.—because she believed the curriculum was sexist, she was one of only two

aggressively and shouted an obscenity in the hallway. . . . And continue[d] to shout obscenities from the hallway."

women in the class, and she felt the instructor was disrespectful. The service provider told a social worker Mother was terminated from the program because she was disruptive and used obscenities towards the other clients. Mother also told a social worker the children did not want therapy, she did not believe they needed it, and she would not force it on them. She likewise felt there was no need for Jay and Joh to be assessed for IEPs because both already had student support team plans.

### 2. *Adjudication*

In January 2021, the juvenile court held a contested adjudication hearing on the operative petitions. The juvenile court heard testimony by Joh, social worker Adina B., Mother's niece, and Mother.

Mother testified, among other things, that she did not obtain IEP assessments for Jay and Joh because she felt they did not require IEPs and "[w]hen that starts, it's a cycle and it continues in your education." She believed the "less rigorous" student study team programs in which they participated were "almost the same." Mother also testified she refused to have her children undergo psychological evaluations in 2019 because she felt they had not "experienced anything traumatic," but she was now amenable to having them evaluated because she believed the children were neglected and abused in foster care.

The juvenile court took jurisdiction over the children pursuant to section 300, subdivisions (a), (b), and (j). As to the domestic violence allegations, the court found them true. The court reasoned that even if S.H. did not strangle Mother, Mother admitted that he threatened to kill her, she was convicted of trying to hit S.H. with her car, and they thereafter maintained

contact in violation of a protective order. As to allegations of substance abuse, the juvenile court indicated it was "well past" deciding whether Mother's marijuana abuse affected the children because this issue was already litigated and appealed. In any case, the juvenile court reasoned the children were aware of Mother's marijuana use because they knew not to go into the garage. Mother's refusal to submit to drug testing was a problem because the juvenile court had no way to determine how much marijuana she was using or to confirm that she was not abusing other drugs. The juvenile court further found Mother failed to comply with orders to undergo a mental health assessment and to obtain services for the children, including counseling and IEP assessments. Mother's conflict with a social worker did not excuse her non-compliance, because, in the court's view, Mother "had a problem with everyone involved in this case": she did not cooperate with the Department and told multiple social workers that she would not comply with court orders. Finally, as to medical neglect, the juvenile court did not credit Mother's testimony that she was physically unable to take Jay to his medical appointments. Her pregnancy was no excuse, in the juvenile court's view, because she was willing to leave the hospital against medical advice when she had the baby.

### 3. *Disposition*

The juvenile court heard additional testimony from Mother and social worker Sandee T. at the disposition hearing. Mother testified she was currently participating in mental health services and attending Alcoholics Anonymous meetings. Therapy was not impacting "the parenting of [her] children" but was "helping [her] deal with" the dependency proceedings. She

10

planned to start a new domestic violence class later in the month. She was no longer using marijuana and was willing to submit to drug testing. She still objected to IEPs for her children, but stated she might be amenable to "just an assessment." She said she would address Jay's medical issues.

Mother further testified that although she did not get along with the previously assigned social worker, she had a much better relationship with her current social worker and would allow her into her home any time. She also testified, however, that she "didn't need anyone's help" and she "just knew as a mom that [she] was doing everything in [her] power to keep [the children] away from things that they needed to be kept away from, and leading them in the right direction . . . ."

Social worker Sandee T. was assigned to Mother's case in February 2020. During this time, Mother completed a 12-week parenting class. The social worker testified that the instructor told her Mother was sometimes distracted or unable to focus. Mother claimed she was in therapy, but Sandee had not yet called the provider for confirmation. Sandee observed visits between Mother and the children and testified that Mother's conduct varied: "She is definitely there and engaged and presents as a mom," including by singing with the children and "tr[ying] to teach them things," but Sandee sometimes had to "redirect[ ]" Mother when she spoke negatively about caregivers in front of the children or let the children wander off. Sandee had "some concerns" about returning the children to Mother and expressed her desire to have Mother submit to drug testing notwithstanding Mother's claim to have stopped using marijuana. Sandee also suggested Mother needed to

11

demonstrate "more consistency with her . . . mental health services" and avoid unhealthy relationships.

The juvenile court found a substantial danger to the children's physical and emotional well-being and no reasonable means by which to protect them without removing them from Mother's care. The court did not credit Mother's testimony that her resistance to services was due to conflict with specific social workers because "[s]he's had multiple issues with social workers, including making threats in the [Department's] lobby" and she was angry and disruptive in domestic violence classes. Further, as to Mother's substance abuse, the court concluded there was no evidence she was no longer using marijuana, other than her own testimony. The juvenile court said it had no faith Mother would comply with court orders—adding her claimed willingness to cooperate with social worker Sandee was irrelevant because the juvenile court could not "guarantee that [a particular social worker] would always be there."

Significantly for purposes of this appeal, the juvenile court's disposition order authorized Mother to have monitored visits with the children three times per week. Mother was ordered to have shared educational rights concerning the children,[4] but the juvenile court cautioned that "[i]f she stops any

---

[4]     The appellate record does not conclusively establish with whom Mother shared educational rights shortly after the disposition hearing. When counsel for the children inquired as to whether sharing would be with the current caregivers, the juvenile court replied, "I'm going to let you make the decision as to who it's going to end up being. If it's not the caregivers, we need to find someone that would assist these children." The juvenile court's minute orders indicate "Minors' counsel is to assess for a new coeducational rights holder." In a subsequent

12

of the service providers from moving forward, then her rights would be restricted."

### B.     *Proceedings Following the Disposition Hearing*

About six weeks after the disposition hearing, in February 2021, the Department petitioned the juvenile court to modify its disposition order based on changed circumstances.[5] The Department asked the juvenile court to limit Mother to one visit with the children per week and to restrict her rights to make educational decisions for them. Over the ensuing months, the Department submitted several reports documenting facts relevant to these recommendations and other case issues. In a report filed shortly before the June 2021 hearing when the Department's changed circumstances petition was heard by the court, the Department clarified its recommendation concerning educational rights and asked the juvenile court to appoint a new rights holder for Jay, Joh, and Jor, and a new co-holder for Jah.[6]

---

Department report, the Department requested the juvenile court "unappoint Maternal Aunt . . . as Educational Rights Holder for [Jay], [Joh], and [Jor] and to appoint a new Educational and Developmental Rights Holder for each child . . . and [assign] a co-holder . . . to [Jah]."

[5]     The juvenile court denied the petition filed in February 2021 because the Department did not use the correct form. The Department filed a new petition making the same recommendations in March 2021.

[6]     Jou and Jan's paternal grandmother was appointed their educational rights holder in March 2020, and they had regional center referrals pending in 2021. The Department did not seek to

We elaborate on what occurred, focusing on these two topics: visitation and educational rights.

### 1. *Visitation*

The Department's reports detail three major issues relating to Mother's contact with the children: the presence of other friends and family at visits that made them difficult to monitor, several instances of unmonitored contact between Mother and the children, and noncompliance with COVID-19 safety protocols.

### a. *other visitors*

The Department reported that, in January 2021, Mother invited "multiple" family members to a visit with the children that took place on Joh's birthday without first notifying the Department. The monitor was accordingly unable to monitor all the adults and children at one time. A social worker who attempted to identify the attendees following the visit was unable to do so. Later, during a scheduled visit in April 2021, Mother invited approximately 20 friends and family from different households and again did not notify the Department in advance. The visitation monitor unsurprisingly reported "he was unable to manage the party."

---

modify the previous order appointing Jou and Jan's paternal grandmother as their educational rights holder.

### b. unmonitored contact

Mother provided cell phones to Jay, Joh, and Jor without notifying the Department.[7]

Mother had extensive unmonitored contact with Joh. He repeatedly ran away from his foster home and, on at least two occasions, visited Mother. In one instance, Mother let Joh play with a dog she bought him for his birthday before taking him to a Los Angeles Sheriff's Department (LASD) station. Joh was upset to find that Mother was again living with S.H., and he later told a social worker it was S.H. who demanded she bring Joh to the LASD station. On another occasion, Mother dropped Joh off at her parents' home to stay the night. When she learned a social worker was going to pick up Joh, Mother drove back to her parents' home, "grabbed [Joh] by the wrist and told him to get in her car." Eventually, Mother brought Joh back to the home, but she "stood in the doorway and stated that she would not release [Joh] back to the Department."

In April 2021, Joh's caregiver reported Joh had stolen his old cell phone and used it to exchange text messages with Mother and a maternal cousin. It is not clear which of the two sets of screenshots attached to the Department's report involves Mother and which involves the cousin, but one told Joh he "need[ed] to move" and the other told Joh to keep the stolen phone hidden.

The Department submitted evidence suggesting contact with Mother prompted at least two of the children to act out.

---

[7]     Joh showed a social worker text messages in which he asked Mother if the Department knew about the phone "as he [did not] want to be in trouble for having it." Mother (falsely) assured Joh the Department was aware of the phone and told him "u have rights to have contact with me."

15

Joh's therapist reported Mother was a "trigger" for Joh and both the therapist and Joh's caregiver observed "that after visitations [Joh's] defiant behaviors are significantly increased." Jah told a caregiver that Mother "told her if she acts bad, she [would] get to come home." Jah confirmed this statement to a social worker and added, "but I don't know why I do it, why I listen when I don't know if I want to live with [Mother] again."

### c. COVID-19 safety measures

The Department reported that in January 2021 Mother refused to put on a mask before hugging and kissing Jay. A few weeks later, Mother removed Jor's mask and kissed her on the mouth. During a subsequent visit, Mother refused to wear a mask "which in turn influenced the children not to wear their masks." When a social worker monitoring the visit said it would be cancelled due to Mother's failure to wear a mask, Mother was reported to have "aggressively shoved a slice of pizza in her mouth and shouted, 'I'M EATING' while making chewing sounds before putting her mask on her face." Further, during the previously mentioned April 2021 visit with 20 friends and family members, no one wore a mask. Mother and the children also wore masks around their chins during a visit a couple weeks later. (This was after the juvenile court issued an order on April 15, 2021, requiring "[a]ll parents . . . to wear masks to visits and follow all COVID protocols.")

### 2. Educational rights

Following the January 2021 disposition hearing, Mother told a Department social worker she would sign releases for court ordered IEP assessments. When the social worker followed up in

16

February 2021, Mother refused to consent to IEP assessments. Mother reasoned Jay did not need an IEP because he was able to read and Joh would not benefit from an IEP because, although he had behavioral issues, he would "be put in the class with all the kids with their own behavior problems . . . ." In March 2021, Mother told a social worker "'my children do not need [an IEP assessment] so you can stop asking me.'"

Joh told a Department social worker he wanted an IEP to address his behavioral issues on multiple occasions. His therapist agreed he was in "dire need of an IEP for his behaviors." A few months after the disposition hearing, Joh was suspended from school for "screaming" at a teacher who prevented him from listening to music during a lecture. Mother scheduled a student study team (SST) meeting with Joh's teachers in May 2021 to address additional support "in the areas of Academics and/or Speech," but refused to allow Joh's social worker or caregiver to attend. The school's summary of the meeting indicates Mother was the "sole Ed Rights Holder." Joh stated he wanted an IEP and a tutor, but the SST agreed that because he was "performing only slightly below grade level," he would be adequately served by resources already in place and would "not be referred for an assessment to determine special education eligibility at this time." Joh's behavioral issues were not addressed.

The Department reported Jay had "satisfactory grades," but noted he "shows signs of struggle[ ] and delays compared to classmates." Based on Mother's admitted use of marijuana in the past, the Department was concerned Jay "may have [a] mild disability that has not been assessed." A social worker opined Jay and Joh, both then 12 years old, "struggle[d] with the concept

17

of time" and were unable to tell "a story with a beginning, middle, and end and in that order."

Jor did not complete all of her schoolwork and, on at least two occasions in 2021, threw violent tantrums when directed to complete missing assignments. These included slamming a school laptop on a counter, "lightly" hitting her head against a wall, and throwing items at her caregiver. When Jor's caregiver asked Mother to encourage Jor to go to school, Mother told a social worker that "'if she [i.e., the caregiver] [is] going to raise my kids then I don't need to tell my child what to do . . . .'" Jor's teachers had to closely monitor her internet use and were "often closing down her internet tabs where she [was] watching Youtube and TikTok videos instead of paying attention." Jor responded by shouting at a teacher, calling her names, and screaming "I hate you." A school counselor suggested both Jor and Jah would benefit from "more intensive mental health services." The Department reported Jor responded "very well to positive affirmation" and suggested she would benefit from additional tutoring, but her school was unable to provide free resources without an IEP.

Jah's father, A.B., requested an IEP assessment in February 2021 and Jah's SST planned to assess her further. The Department asked the juvenile court to appoint a "second co-holder" of educational rights as to Jah to "assist with speed of acquiring signed documents for referrals."

### 3. *The Hearing on the Department's Changed Circumstances Petition*

The juvenile court held a hearing on the Department's petition in June 2021.

18

With respect to visitation, Mother argued her health issues made it difficult for her to breathe wearing a mask. She also argued that she resorted to unmonitored contact with the children because she did not receive all visits to which she was entitled. With respect to educational rights, Mother argued she was highly involved in the children's education and her resistance to IEPs was justified by the children's academic performance.

The children's attorney believed the children's current caregivers should have full educational rights but did not join the Department's recommendation to reduce visitation. The children's attorney believed safety issues could be resolved by means short of limiting Mother to one in-person visit per week, i.e., requiring two monitors, excluding others from the visits, or making some of the visits telephonic.

The juvenile court was convinced Mother's in-person visits should be reduced. The juvenile court was skeptical of Mother's inability to wear a mask because she used marijuana and emphasized that, in any case, "she could instruct her children to put on their masks appropriately . . . ." The juvenile court ordered Mother to have three monitored visits of two hours each per week: one in person and two by telephone. The court emphasized the in-person visits were to be "COVID compliant," meaning Mother was to wear a mask and require her children to wear masks. The juvenile court also ordered Mother's educational rights restricted based on her resistance to the Department and caregivers attending IEP meetings and asked minors' counsel to submit proposed orders designating educational rights holders for all the children.

19

## II.  DISCUSSION

The juvenile court did not abuse its discretion in granting the Department's changed circumstances petition.  Reducing Mother's three weekly in-person monitored visits to one in-person and two telephonic visits was warranted in light of Mother's conduct during visitation.  She made effective supervision—the need for which was underscored by Mother's conduct outside of visits—impossible on more than one occasion and she willfully increased the children and their caregivers' risk of contracting COVID-19.  The restriction of Mother's educational rights was warranted by her persistent refusal to comply with court orders to have Jay and Joh assessed for IEPs and her failure to address Jor's needs.[8]

### A.     *Visitation*

Section 388 provides that a person with an interest in a child may petition the juvenile court to modify a previous order based on changed circumstances.  (§ 388, subd. (a)(1).)  The petitioner has the burden to show, by a preponderance of the evidence, both that circumstances have changed and the proposed modification is in the best interest of the child.  (*In re B.D.* (2008) 159 Cal.App.4th 1218, 1228.)  We review the grant or denial of a changed circumstances petition under section 388 for abuse of discretion.  (*Ibid.*; see also *In re Alayah J.* (2017) 9 Cal.App.5th 469, 478.)

The juvenile court ordered monitored visitation at the disposition hearing based on Mother's long history of

---

[8]     Mother does not challenge the juvenile court's order regarding educational rights as to Jah.

20

inappropriate behavior.  At that time, the juvenile court reasonably believed this would be sufficient to protect the children.  (§ 362.1, subd. (a)(1)(A) ["Visitation shall be as frequent as possible, *consistent with the well-being of the child*," emphasis added].)  Mother's conduct during in-person visits demonstrated it was not.

On at least two occasions, monitors were unable to control the visits because Mother brought friends and family without advance notice.  These problems were compounded by Mother's conduct outside of visits: Jah told the Department Mother encouraged bad behavior to sabotage her placement and unmonitored contact between Joh and Mother—including instances in which he ran away and she did not promptly return him to his caregiver—did nothing to improve Joh's struggles in his foster care placement.  In addition, and whatever the merits of Mother's claim that she could not wear a mask, her flouting of COVID-19 protocols went well beyond a personal refusal to wear a mask.  Mother's refusal to wear a mask herself and to ensure the children wore their masks persisted even after the juvenile court made orders requiring such compliance.  On these facts, the juvenile court reasonably concluded Mother's in-person visits were threatening the children's well-being; the modified visitation order mitigated these risks by moving most visits to a more readily monitored setting while ensuring Mother and the children continued to have some weekly in-person contact.

Mother's counterargument to all this rests principally on her view that her hostile posture toward the Department, caregivers, and monitors was justified.[9]  She emphasizes she did

---

[9]    Mother also asserts there was no substantial evidence of a change in circumstances because her "lack of compliance with

21

not receive all of the visits to which she was entitled, highlights episodes in which she was agitated because caregivers allowed the children to dress in a manner she deemed inappropriate, and selectively quotes pre-disposition reports offering qualified praise of her parenting skills.  None of this is relevant, however, to the juvenile court's assessment of whether Mother's post-disposition conduct warranted modification of its visitation order.  Even if Mother's concerns were well founded, her remedy was not to host unmanageable gatherings, to evade the court order for monitored contact with the children, and to ignore COVID-19 protocols.

### B.     Educational Rights

Mother does not challenge the juvenile court's order limiting her educational rights under the framework of section 388.  That is to say, she does not suggest there was no change in circumstances following disposition or that restricting her parental rights was not in the children's best interest.  Rather, she contends the juvenile court's order violates her constitutionally protected liberty interest in directing her children's education.  (See *In re R.W.* (2009) 172 Cal.App.4th 1268, 1276.)  This interest is not, however, absolute (*ibid.*), and

---

court-ordered services . . . was cited by the [juvenile] court in support of its order for removal at disposition."  This is unpersuasive.  Her disregard of court orders took on new and different forms (e.g., flouting of COVID-19 safety protocols), and regardless, her continued efforts to resist rules put in place by the court at disposition is itself a changed circumstance warranting further efforts by the juvenile court to enforce the orders it previously made.

22

the restrictions ordered here (which are consistent with statutory directives) do not transgress constitutional limitations.

"If the parent or guardian is unwilling or unable to participate in making an educational decision for their child, or if other circumstances exist that compromise the ability of the parent or guardian to make educational decisions for the child, the county welfare department or social worker shall consider whether the right of the parent or guardian to make educational decisions for the child should be limited." (§ 366.1, subd. (e).) When a child is adjudicated a dependent of the juvenile court, "the court may limit the control to be exercised over the dependent child by any parent." (§ 361, subd. (a)(1).) Limitations on a parent's right to make educational decisions for the child "may not exceed those necessary to protect the child." (§ 361, subd. (a)(1).)

Here, Mother had not complied with the juvenile court's May 2019 order to obtain IEP assessments for Jay and Joh by the January 2021 jurisdiction and disposition hearings, but she indicated she would do so. By the next month, she was again refusing to cooperate. When she eventually requested an SST meeting for Joh in May 2021, she excluded the Department and Joh's caregiver and the child's behavioral issues were not discussed. Mother made no effort to comply with the juvenile court's order as to Jay. There was no court order to have Jor assessed for an IEP, but Mother effectively abdicated any responsibility for Jor's education by refusing to "tell [Jor] what to do" while Jor was not living with her.

Mother nonetheless contends the juvenile court erred in restricting her educational rights because there was no basis for the earlier order requiring her to obtain IEP assessments for Jay

and Joh. She highlights their satisfactory school attendance before they were removed from her care and argues their grades did not "automatically mandate the need for an IEP." At no time, however, has the juvenile court found otherwise. Mother's argument regarding the necessity of *implementing* IEPs does not address the appropriateness of assessing the children for IEPs. Assuming Mother is correct that the evidentiary record does not currently establish the need for IEPs, it still provides ample support for the juvenile court's view that complete assessments were necessary for Jay and Joh. Moreover, Mother's demonstrated resistance to services—and refusal to so much as encourage Jor to attend classes—shows she was unwilling or unable to address Jor's educational needs and supports the juvenile court's educational rights order. (*In re D.C.* (2015) 243 Cal.App.4th 41, 58 ["Just as in other areas of dependency law, the juvenile court need not wait until harm occurs before" limiting a parent's educational rights].)

## DISPOSITION

The juvenile court's order granting the Department's changed circumstances petition is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS


BAKER, Acting P. J.

We concur:


MOOR, J.


KIM, J.